**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Z. T. OSBORN, Jr., Defendant-Appellant.**

**No. 16056.**

United States Court of Appeals
Sixth Circuit.

Aug. 27, 1965.

498

Jacob Kossman, Philadelphia, Pa. (Jack Norman, Nashville, Tenn., on the brief),·for appellant.

Kirby W. Patterson, Atty., Dept. of Justice, Washington, D. C. (Herbert J. Miller, Jr., Asst. Atty. Gen., Beatrice Rosenberg, Atty., Dept. of Justice, Washington, D. C., James F. Neal, U. S. Atty., Nashville, Tenn., on the brief), for appellee.

Before MILLER, O'SULLIVAN and EDWARDS, Circuit Judges.

EDWARDS, Circuit Judge.

Defendant appeals from his conviction before a United States District Court jury in Nashville, Tennessee, on one of two counts charging him with the crime of jury tampering. He was sentenced to three and one-half years in the federal penitentiary.

Defendant had been indicted on three counts of violating 18 U.S.C. § 1503. Count One of the indictment charged that appellant in November 1963 "did request, counsel, and direct" one Robert D. Vick to contact Ralph A. Elliott, who was and known to be a member of the petit jury panel from which jurors were to be drawn for a pending case, "and to offer and promise to pay the said Ralph A. Elliott $10,000 to induce the said Elliott to vote for an acquittal" if Elliott were to be selected as a juror for that trial, this in violation of 18 U.S.C. § 1503.

Count Two charged a similar offense in November 1962 in relation to the "Test Fleet" trial, the request being alleged to have been made to a lawyer named Beard to approach D. M. Harrison, the husband of a sitting juror.

Defendant was convicted on Count One and acquitted on Count Two. The third count had been dismissed before trial.

At the time of the events in question, defendant was a prominent and successful lawyer who had handled a good deal of important litigation. Just before the happenings which led to this indictment, he had served (and was serving) as local counsel for defendant James R. Hoffa in United States v. James R. Hoffa & Commercial Carriers, Inc. (Criminal No. 13,-241, United States District Court, Middle District of Tennessee, Nashville Division) (the so-called "Test Fleet" case) wherein his client had been the subject of mistrial resulting from a divided or "hung" jury.

Subsequent to the conclusion of the "Test Fleet" case, evidence was presented to a federal grand jury which resulted in the indictment of Hoffa and a number of other defendants on charges of jury

tampering pertaining to alleged approaches to the "Test Fleet" case jury. United States v. Hoffa, et al., D.C., 235 F.Supp. 611 (United States District Court, Eastern District of Tennessee, Southern Division, at Chattanooga). See 349 F.2d 20 (C.A. 6, 1965)

This Hoffa jury tampering case was originally scheduled to be tried in the United States District Court for the Middle District of Tennessee, Nashville, Tennessee, and it was expected that the jury panel for that District would be the panel from which the Hoffa, et al., jury tampering case would be chosen.

Prior to the transfer of the United States v. Hoffa, et al., trial on jury tampering to Chattanooga, Tennessee, the Federal Bureau of Investigation called to the attention of two of the United States District Judges for the Middle District of Tennessee (Judges Miller and Gray) that an informant, one Vick, had brought them charges to the effect that Hoffa's local counsel, defendant herein, was seeking to make contact through intermediaries with prospective members of the Hoffa, et al., jury. Vick was an officer of the Nashville Police Department whom defendant had employed during the "Test Fleet" trial to investigate jurors.

The two District Judges, although openly skeptical of the information, authorized the informant to seek further conversation with defendant, carrying on his person a recording device by which they, the judges, would later be able to hear what transpired.

Vick twice talked with appellant with the recording device concealed on him, but it twice failed to operate. On the third occasion the recorder did operate and the tape thus produced resulted in such confirmation of Vick's information as to occasion appellant's disbarment in the federal courts and the indictment in the present case.

At trial of the presently considered charges Vick testified and the recording of the last of his conversations with appellant was introduced in corroboration.

Vick testified that his representations to appellant concerning conversations with and willingness to bribe prospective juror Elliott were false. At the time they were made, Vick, indicated he was reporting to FBI and Justice Department personnel. The jury also heard defendant's admission that the transcript of this recording was "substantially correct."

Since on this appeal defendant's primary appellate issue is a claim of legal entrapment, we feel it relevant to reproduce the record of this conversation in its entirety:

"GIRL: You can go in now.

"VICK: O.K. honey.

"Hello, Mr. Osborn.

"OSBORN: Hello, Bob, close the door, my friend, and let's see what's up.

"VICK: How're you doing?

"OSBORN: No good. How're you doing?

"VICK: Oh, pretty good. You want to talk in here?

"OSBORN: How far did you go?

"VICK: Well, pretty far.

"OSBORN: Maybe we'd better

. . .

"VICK: Whatever you say. Don't make any difference to me.

"OSBORN: (Inaudible whisper.)

"VICK: I'm comfortable, but er, this chair sits good, but we'll take off if you want to, but

"OSBORN: Did you talk to him?

"VICK: Huh?

"OSBORN: Did you talk to him?

"VICK: Yeah. I went down to Springfield Saturday morning and talked to er.

"OSBORN: Elliott?

"VICK: Elliott.

"OSBORN: (Inaudible whisper.)

"VICK: Huh?

"OSBORN: Is there any chance in the world that he would report you?

"VICK: That he will report me to the FBI? Why of course, there's al-

ways a chance, but I wouldn't get into it if I thought it was very, very great.

"OSBORN: (Laughed.)

"VICK: You understand that.

"OSBORN: (Laughing) Yeah, I do know. Old Bob first.

"VICK: That's right. Don't worry. I'm gonna take care of old Bob and I know, and of course I'm depending on you to take care of old Bob if anything, if anything goes wrong.

"OSBORN: I am. I am. Why certainly.

"VICK: Er, we had coffee Saturday morning and now I had previously told you that it's the son.

"OSBORN: It is?

"VICK: Yes, and not the father.

"OSBORN: That's right.

"VICK: The son is Ralph Alden Elliott and the father is Ralph Donnal. Alden is er—Marie, that's Ralph's wife who killed herself. That was her maiden name, Alden, see? Anway, we had coffee and he's been on a hung jury up here this week, see?

"OSBORN: I know that.

"VICK: Well, I didn't know that but anyway, he brought that up so he got to talking about the last Hoffa case being hung, you known, and some guy refusing $10,000 to hang it, see, and he said the guy was crazy, he should've took it, you know, and so we talked about and so just discreetly, you know, and course I'm really playing this thing slow, that's the reason I asked you if you wanted a lawyer down there to handle it or you wanted me to handle it, cause I'm gonna play it easy.

"OSBORN: The less people, the better.

"VICK: That's right. Well, I'm gonna play it slow and easy myself and er, anyway, we talked about er, something about five thousand now and five thousand later, see, so he did, he brought up five thousand see, and talking about about (sic) how they pay it off you know and things like that. I don't know whether he suspected why I was there or not cause I don't just drop out of the blue to visit him socially, you know. We're friends, close, and kin, cousins, but I don't ordinarily just, we don't fraternize, you know, and er, so he seemed very receptive for er, to hang the thing for five now and five later. Now, er I thought I would report back to you and see what you say.

"OSBORN: That's fine! The thing to do is set it up for a point later so you won't be running back and forth.

"VICK: Yeah.

"OSBORN: Tell him it's a deal.

"VICK: It's what?

"OSBORN: That it's a deal. What we'll have to do when it gets down to the trial date, when we know the date, tomorrow for example if the Supreme Court rules against us, well, within a week we'll know when the trial comes. Then he has to be certain that when he gets on, he's got to know that he'll just be talking to you and nobody else.

"VICK: Social strictly.

"OSBORN: O yeah.

"VICK: I've got my story all fixed on that.

"OSBORN: Then he will have to know where to, he will have to know where to come.

"VICK: Well, er * * *

"OSBORN: And he'll have to know when.

"VICK: Er, do you want to use him yourself? You want me to handle it or what?

"OSBORN: Uh huh. You're gonna handle it yourself.

"VICK: All right. You want to know it when he's ready, when I

think he's ready for the five thousand. Is that right?

"OSBORN: Well no, when he gets on the panel, once he gets on the jury. Provided he gets on the panel.

"VICK: Yeah. Oh yeah. That's right. That's right. Well now, he's on the number one.

"OSBORN: I know, but now * * *

"VICK: But you don't know that would be the one.

"OSBORN: Well, I know this, that if we go to trial before that jury he'll be on it but suppose the government challenges him over being on another hung jury.

"VICK: Oh, I see.

"OSBORN: Where are we then?

"VICK: Oh I see. I see.

"OSBORN: So we have to be certain that he makes it on the jury.

"VICK: Well now, here's one thing, Tommy. He's a member of the CWA, see, and the Teamsters, or

"OSBORN: Well, they'll knock him off.

"VICK: Naw, they won't. They've had a fight with the CWA, see?

"OSBORN: I think everything looks perfect.

"VICK: I think it's in our favor, see. I think that'll work to our favor.

"OSBORN: That's why I'm so anxious that they accept him.

"VICK: I think they would, too. I don't think they would have a reason in the world to. I don't think that I'm under any surveillance or suspicion or anything like that.

"OSBORN: I don't think so.

"VICK: I don't know. I don't frankly think, since last year and since I told them I was through with the thing, I don't think I have been. Now Fred,

"OSBORN: I don't think you have either.

"VICK: You know Fred and I may not (pause), he may be too suspicious and I may not be suspicious enough. I don't know.

"OSBORN: I think you've got it sized up exactly right.

"VICK: Well, I think so.

"OSBORN: Now, you know you promised that fella that you would have nothing more to do with that case.

"VICK: That's right.

"OSBORN: At that time you had already checked on some of the jury that went into Miller's court. You went ahead and did that.

"VICK. Well, here's another thing, Tommy.

"OSBORN: * * * church affiliations, background, occupation and that sort of thing on those that went into Miller's court. You didn't even touch them. You didn't even investigate the people that were in Judge Gray's court.

"VICK: Well, here's the thing about it, Tommy. Soon as this damn thing's over, they're gonna kick my—out anyway, so probably Fred's too. So, I might as well get out of it what I can. The way I look at it. I might be wrong, cause the Tennessean is not gonna have anything to do with anybody that's had anything to do with the case now or in the past, you know that. Cause they're too close to the Kennedys.

"OSBORN: All right, so we'll leave it to you. The only thing to do would be to tell him in other words your next contact with him would be to tell him if he wants that deal, he's got it.

"VICK: O.K.

"OSBORN: The only thing it depends upon is him being accepted on the jury. If the government challenges him there will be no deal.

"VICK: All right. If he is seated.

"OSBORN: If he's seated.

"VICK: He can expect five thousand then and

"OSBORN: Immediately.

"VICK: Immediately and then five thousand when it's hung. Is that right?

"OSBORN: All the way, now!

"VICK: Oh, he's got to stay all the way?

"OSBORN: All the way.

"VICK: No swing. You don't want him to swing like we discussed once before. You want him

"OSBORN: Of course, he could be guided by his own b , but that always leave a question. The thing to do is just stick with his crowd. That way we'll look better and maybe they'll have to go to another trial if we get a pretty good count.

"VICK: Oh. Now, I'm going to play it just like you told me previously, to reassure him and keep him from getting panicky, you know. I have reason to believe that he won't be alone, you know.

"OSBORN: You assure him of that. 100%.

"VICK: And to keep any fears down that he might have, see?

"OSBORN: Tell him there will be at least two others with him.

"VICK: Now, another thing, I want to ask you does John know anything. You know. I originally told John about me knowing.

"OSBORN: He does not know one thing.

"VICK: He doesn't know? O.K.

"OSBORN: He'll come in and recommend this man —— and I'll say well just let it alone, you know.

"VICK: Yeah. So he doesn't know anything about this at all?

"OSBORN: Nothing.

"VICK: Now he hasn't seen me. When I first came here he was in here, see.

"OSBORN: —— We'll keep it secret. The way to keep it safe is that nobody knows about it but you and me —— Where could they ever go?

"VICK: Well, that's it, I reckon, or I'll probable go down there. See. I'm off tonight. I'm off Sunday and Monday, see. That's why I talked to you yesterday. I had a notion to go down there yesterday cause I was off last night and I'm off again tonight.

"OSBORN: It will be a week at least until we know the trial date.

"VICK: O.K. You want to hold up doing anything further till we know.

"OSBORN: Unless he should happen to give you a call and —— something like that, then you just tell him, whenever you happen to run into him.

"VICK: Well, he's not apt to call, cause see

"OSBORN: You were very circumspect.

"VICK: Yeah. We havn't talked really definite and I think he clearly understands. Now, he might, it semed to me that maybe he thought I was joking or, you know.

"OSBORN: That's a good way to leave it, he's the one that brought it up.

"VICK: That's right.

"OSBORN: ——

"VICK: Well, I knew he would before I went down there.

"OSBORN: Well, ——

"VICK: Huh?

"OSBORN: I'll be talking to you.

"VICK: I'll wait a day or two.

"OSBORN: Yeah, I would.

"VICK: Before I contact him. Don't want to seem anxious and er

"OSBORN: ——

"VICK: O.K. See you later."

■ The courts have repeatedly held that a recording of a conversation made by one party in the presence of but without the knowledge of another party, may be admitted in evidence to corroborate the testimony of the party who makes the record.[1] Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); Monroe v. United States, 98 U.S.App.D.C. 228, 234 F.2d 49 (1956), cert. denied, 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956); United States v. Hall, 342 F.2d 849 (C.A.4, 1965); United States v. Schanerman, 150 F.2d 941 (C.A.3, 1945); Addison v. United States, 317 F.2d 808 (C.A.5, 1963), cert. denied, 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d 605 (1964); Byrnes v. United States, 327 F.2d 825 (C.A.9, 1964).

The principal limitation on this holding pertains to establishing the authenticity and the accuracy of the record. In the instant case the authenticity and accuracy of the quoted transcript is conceded.

In United States v. Miller, 316 F.2d 81 (C.A.6, 1963), this court specifically declined to hold inadmissible evidence of government agents based on their hearing a radio transmission of a conversation by use of a transmitter (Fargo device) secreted on the person of one of the parties.

The statute under which this case was tried provides as follows:

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any theatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1503.

■ This statute mirrors the national concern with preserving the integrity of the jury trial as the cornerstone of this nation's criminal law. Under its terms it is obvious that Congress has intended not merely to make successful bribing of a juror a crime, but likewise to make it a criminal offense to do any act which has the ultimate bribing of a juror as its purpose.

Defendant herein contends first, that what he did, did not constitute violation

---

1. In view of the strong dissent in Lopez (See Lopez v. United States, 373 U.S. at 446, 83 S.Ct. 1381) to the controlling rule described above, it may be relevant to note that the essentials of search warrant procedures were carried out in the instant case, albeit no statutory authority for such a warrant exists. These include appearance before a court, a showing of probable cause, a specific judicial authorization for the search, including a description of method and object.

of this statute, and second that if it did, he was entrapped into doing it.

The principal interpretations of this statute have been made by the United States Supreme Court in United States v. Russell, 255 U.S. 138, 41 S.Ct. 260, 65 L.Ed. 553 (1921); Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L. Ed. 413 (1932); and Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed. 2d 848 (1958). (See also United States v. Gosser, 339 F.2d 102 (C.A.6, 1964)). In these cases the following principles were laid down pertaining to the substantive offense and to the defense of legal entrapment.

In Russell we find this definition of the key word "endeavor."

"The word of the section is 'endeavor,' and by using it the section got rid of the technicalities which might be urged as besetting the word 'attempt,' and it describes any effort or essay to accomplish the evil purpose that the section was enacted to prevent. Criminality does not get rid of its evil quality by the precautions it takes against consequences, personal or pecuniary. It is a somewhat novel excuse to urge that Russell's action was not criminal, because he was cautious enough to consider its cost and be sure of its success. The section, however, is not directed at success in corrupting a juror, but at the 'endeavor' to do so. Experimental approaches to the corruption of a juror are the 'endeavor' of the section." United States v. Russell, supra, 255 U.S. at 143, 41 S.Ct. at 261.

In Sherman we find this discussion of entrapment:

"To determine whether entrapment has been established a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. The principles by which the courts are to make this determination were outlined in Sorrells. On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an 'appropriate and searching inquiry into his own conduct and *predisposition*' as bearing on his claim of innocence." (Emphasis supplied.) Sherman v. United States, supra, 356 U.S. at 372–373, 78 S.Ct. at 821.

And in Sorrells we find these crucial distinctions:

"It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises. Grimm v. United States, 156 U.S. 604, 610 [15 S.Ct. 470, 39 L.Ed. 550]; Goode v. United States 159 U.S. 663, 669 [16 S.Ct. 136, 40 L.Ed. 297]; Rosen v. United States, 161 U.S. 29, 42 [16 S.Ct. 434, 480, 40 L.Ed. 606]; Andrews v. United States, 162 U.S. 420, 423 [16 S.Ct. 798, 40 L.Ed. 1023]; Price v. United States, 165 U.S. 311, 315 [17 S.Ct. 366, 41 L.Ed. 727]; Bates v. United States, (C.C.) 10 F. 92, 94, note page 97; United States v. Reisenweber [2 Cir.], 288 F. 520, 526; Aultman v. United States [5 Cir.], 289 F. 251. The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic, the prohibited publication, the fraudulent use of the mails, the illegal conspiracy or other offenses, and thus to disclose the would-be violators of the law. A different question is presented when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." Sorrells v. United States, supra 287 U.S. at 441–442, 53 S.Ct. at 212–213. (Footnote omitted.)

In the evidence which we have set forth, we find ample grounds for affirmance of this jury verdict.

We are fully convinced that telling a third party to offer a bribe to a potential juror is a corrupt "endeavor to influence" within the meaning of the statute. 18 U.S.C. § 1503. We do not believe that this act is insulated from prosecution by failure, or by lack of actual intent on the part of the third party ever to make the approach. The falsity of Vick's statement pertaining to Elliott closely parallels the situation in Lopez, where the Supreme Court said:

> "Davis was not guilty of an unlawful invasion of petitioner's office simply because his apparent willingness to accept a bribe was not real. Compare Wong Sun v. United States, 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441]. He was in the office with petitioner's consent, and while there he did not violate the privacy of the office by seizing something surreptitiously without petitioner's knowledge. Compare Gouled v. United States, supra, [255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647]. The only evidence obtained consisted of statements made by Lopez to Davis, statements which Lopez knew full well could be used against him by Davis if he wished. We decline to hold that whenever an offer of a bribe is made in private, and the offeree does not intend to accept, that offer is a constitutionally protected communication." Lopez v. United States, supra 373 U.S. at 438, 83 S.Ct. at 1387.

Further, we find ample evidence to support this jury's rejection of the defense of entrapment. This transcript does not mirror the inducing of an unwilling party to commit a crime. This recorded conversation could have convinced the jury that defendant was a fully informed and eager jury tamperer, ready to seize the opportunity which he saw provided by Vick.

It seems significant to us that defendant was the first to name the juror supposed to be bribed; that after ascertaining that Vick had "gone pretty far," it was he who thought it might be desirable to move the conversation out of his office, presumably for the purpose of greater security; that it was he who decided that Vick should employ no intermediary in his contacts with the Elliott family; and that it was he who insisted that Elliott had to be chosen on the jury before the deal was complete or any money would be due.

Further, we regard the following portion of the transcript as peculiarly invulnerable to the interpretation that defendant had been reluctantly induced and entrapped into participation in a jury tampering scheme not resulting from his own plans and desires:

> "VICK: Oh. Now, I'm going to play it just like you told me previously, to reassure him and keep him from getting panicky, you know. I have reason to believe that he won't be alone, you know.
>
> "OSBORN: You assure him of that. 100%.
>
> "VICK: And to keep any fears down that he might have, see?
>
> "OSBORN: Tell him there will be at least two others with him."

In saying what we have said, we do not ignore the fact that defendant's principal point pertaining to entrapment concerns his argument that in conversations prior to this one he had effectively been induced to participate in the scheme which involved the proposed bribing of Elliott. His testimony pertaining to these prior unrecorded conversations with Vick was evidence which the jury, if convinced of its accuracy, could have held to represent entrapment. But defendant's version of these prior conversations was not undisputed; Vick's testimony as to them was substantially different.

Generally, disputed fact questions concerning entrapment are for the

jury to resolve. Sorrells v. United States, supra; Sherman v. United States, supra, 356 U.S. at 377, n. 8, 78 S.Ct. 819, And here there is undisputed evidence (in the evidence just quoted) from which the jury could have found that at most what the alleged entrapper did (at least on the last visit) was to provide "opportunity" for violation of the law.

We certainly do not find here undisputed evidence of a case where:

"[T]he Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted." Sherman v. United States, supra at 376, 78 S.Ct. at 822. (Footnote omitted.)

██ In defendant's brief much is made of the evil character of the informer, Vick. Vick's willingness to change sides from law enforcement to law violation, depending upon the inducement offered, seems apparent to us—as it doubtless did to the jury. While this moral flexibility was obviously one of the material issues bearing on the credibility of his testimony, it did not prevent jury consideration of that testimony—particularly where, as here, much of the testimony was corroborated by other evidence. United States v. Thomas, 342 F.2d 132 (C.A.6, 1965).

Defendant's protests about the unreliability of Vick are diminished in force by substantial corroboration of the most damaging of Vick's testimony. It must also be remembered that in the first instance he chose Vick to work for him on a jury investigation in a criminal case, well-knowing his police employment[2] and his reputation. And the credibility of defendant's own testimony was greatly damaged, as compared to his prior reputation, by the fact that he lied repeatedly under oath before the two District Judges about knowing anything at all about the Elliott approaches until he was confronted by the record of his own voice.

Further, as opposed to defendant's own testimony as to the nature of these unrecorded conversations, the jury had an opportunity to see and hear the testimony of the defendant and his accuser, Vick. The jury could, and doubtless did, compare the relative intelligence and determination and character and experience and legal training and knowledge of the two in determining whether or not Vick would be likely (as defendant claims) successfully to induce and entrap him.

Our review of the record indicates that there was evidence which required the United States District Judge to submit the case for jury decision.

Our review of the jury charge indicates that the issue of entrapment was properly submitted to this jury.

No challenge is brought to us pertaining to the impartiality of the jury which actually tried this case nor to the events of the trial itself. Defendant made no motion for change of venue.

We are, however, confronted by a challenge to the composition and the impartiality of the grand jury which found the instant indictment. It is claimed that this grand jury was illegally impaneled and was preconditioned by preindictment publicity so as to deprive defendant of due process in its consideration of the government's evidence upon which the indictment was issued.

The first of these issues has been recently and carefully considered by this court, and decided adversely to appellant's claims. United States v. Hoffa, et al., 349 F.2d 20 (C.A.6, 1965). Although this case was before another panel of the court, we concur in the views therein expressed pertaining to the composition of this grand jury. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

██ On the issue of appellant's claim of prejudice resulting from preindictment publicity and alleged failures of the judge properly to screen the grand

---

2. At the time of Vick's first employment by defendant, he was a Deputy Sheriff.

jury panel for bias, we find no grounds for reversal. Mr. Justice Black's opinion in Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) indicates the limited nature of appellate review of grand jury indictment proceedings. Much of Mr. Justice Clark's majority opinion in Beck v. Washington, 369 U.S 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), could be read as directly appli cable to the instant case:

"Ever since Hurtado v California, 110 U.S. 516 [4 S.Ct. 292, 28 L.Ed. 232] (1884), this Court has consistently held that there is no federal constitutional impediment to dispensing entirely with the grand jury in state prosecutions. The State of Washington abandoned its mandatory grand jury practice some 50 years ago. Since that time prosecutions have been instituted on informations filed by the prosecutor, on many occasions without even a prior judicial determination of 'probable cause'—a procedure which has likewise had approval here in such cases as Ocampo v. United States, 234 U.S. 91 [34 S.Ct. 712, 58 L.Ed. 1231] (1914), and Lem Woon v. Oregon, 229 U.S 586 [33 S.Ct 783, 57 L.Ed. 1340] (1913). * * *
"In his attempts before trial to have the indictment set aside petitioner did not contend that any particular grand juror was prejudiced or biased. Rather, he asserted that the judge impaneling the grand jury had breached his duty to ascertain on *voir dire* whether any prospective juror had been influenced by the adverse publicity and that this error had been compounded by his failure to adequately instruct the grand jury concerning bias and prejudice. It may be that the Due Process Clause of the Fourteenth Amendment requires the State, having once resorted to a grand jury procedure, to furnish an unbiased grand jury. Compare Lawn v. United States, 355 U.S. 339, 349–350 [78 S.Ct. 311, 317–318, 2 L.Ed.2d 321] (1958);

Costello v. United States, 350 U.S. 359, 363, [76 S.Ct. 406, 408, 100 L.Ed 397] (1956); Hoffman v. United States, 341 U.S. 479, 485 [71 S.Ct. 814, 817, 95 L.Ed. 1118] (1951). But we find that it is not necessary for us to determine this question; for even if due process would require a State to furnish an unbiased body once it resorted to grand jury procedure—a question upon which we do not remotely intimate any view—we have concluded that Washington, so far as is shown by the record, did so in this case." Beck v. Washington, supra at 545–546, 82 S.Ct. at 957–958. (Footnote omitted.)

 We hold that here, too, as in Beck, the appellant has not borne "the burden of showing essential unfairness" in relation to his indictment. Beck v. Washington, supra 369 U.S. at 558, 82 S.Ct. at 964.

 The essential conflict of evidence developed in this trial pertaining to Count One concerned the initial con versations between Vick and defendant about prospective juror Elliott. Defendant's testimony varied in a number of respects (bearing on the defense of entrapment) from Vick's direct testimony. In this situation the appearance of the two District Judges to identify the Vick affidavit (upon which they authorized further investigation by use of a recording device) and the admission of the affidavit itself, were not reversible error. The affidavit was a prior record of a statement by Vick consistent with his direct testimony which defendant had attacked. The District Judge held that the affidavit and the circumstances surrounding its origin and use were proper rebuttal. We find no abuse of discretion or reversible error in this ruling. Goldsby v. United States, 160 U.S. 70, 16 S.Ct. 216, 40 L.Ed. 343 (1895); United States v. Alaimo, 297 F.2d 604 (C.A.3, 1961), cert. denied, 369 U.S. 817, 82 S.Ct. 829, 7 L.Ed.2d 784 (1962).

In this case at the conclusion of Judge Boyd's charge both sides stated that they

had no exceptions to the jury instructions as given. We have reviewed the claims of error in the charge as given which defendant's counsel now presents on appeal and find no example of "plain error" therein. Rule 52(b) Fed.R.Crim.P. Taking the charge as a whole and its paragraphs in their proper context, we find the charge essentially fair.

As to the instructions submitted by defendant but denied or not employed by the District Judge, we find no reversible error. In most instances cited the instruction was properly covered in the Judge's own language. Under the evidence in this case we do not believe that defendant was entitled to defendant's proffered instructions No. 4 or No. 24.

Defendant's proffered instruction No. 4 would have told the jury that they could not consider any evidence offered pertaining to one count in determining the truth or falsity of the other count. This instruction was not given and the District Judge did charge "that an existing disposition to commit a similar offense is an important factor to consider in determining whether there was a subsequent entrapment." We believe that where entrapment is offered as a defense, that this charge is a proper one. Knight v. United States, 310 F.2d 305 (C.A.5, 1962).

Here evidence pertaining to Count Two was such that the jury might have concluded that defendant rejected the opportunity to make a bribe attempt largely because he deemed it impractical and unlikely to succeed, rather than because he rejected the whole idea.

Defendant's own testimony concerning his conversations with Henry Beard pertaining to juror, Mrs. Harrison, and his subsequent employment of Beard for reporting on jury panel members' backgrounds is hardly consistent with the argument of innocent gullibility which defendant proffered to the jury. We do not believe that the judge's refusal to instruct that the jury could not consider the testimony pertaining to Count Two (in the event they rendered a Not Guilty verdict thereon) was error.

We find no other issues of substance on this appeal and our review of the record does not disclose any reversible error.

Affirmed.