**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Z. T. OSBORN, Jr., Defendant-Appellant.**

**Z. T. OSBORN, Jr., Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

Nos. 17810, 19124.

United States Court of Appeals
Sixth Circuit.

Sept. 19, 1969.

**1022**

Maclin P. Davis, Jr., Nashville, Tenn., for appellant.

Theodore George Gilinsky, Dept. of Justice, Washington, D. C., for appellee; Fred M. Vinson, Jr., Asst. Atty. Gen., Beatrice Rosenberg, Kirby W. Patterson, Attys., Criminal Division, Dept. of Justice, Washington, D. C., Gilbert S. Merritt, Jr., U. S. Atty., Nashville, Tenn., on brief.

Before WEICK, Chief Judge, and O'SULLIVAN, PHILLIPS, EDWARDS, CELEBREZZE, PECK, McCREE and COMBS, Circuit Judges, sitting en banc.

WEICK, Chief Judge.

These appeals were consolidated for argument and were heard by the Court sitting en banc.

Appellant Z. T. Osborn was a prominent Nashville lawyer. He was local counsel for James Hoffa in the criminal case of United States v. Hoffa pending in the United States District Court for the Middle District of Tennessee. That trial resulted in a "hung jury". Osborn was subsequently convicted on May 29, 1964, of endeavoring to bribe a member of the jury panel from which the petit jury to retry the *Hoffa* case was scheduled to be drawn. He was sentenced to three and one-half years imprisonment. He has since been paroled. Osborn's conviction was affirmed by this Court in United States v. Osborn, 350 F.2d 497 (1966), and by the Supreme Court in Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), rehearing denied, 386 U.S. 938, 87 S.Ct. 951, 17 L.Ed.2d 813 (1967).

While his appeal was pending in this Court, Osborn filed in the District Court a second motion for a new trial based on newly discovered evidence which he claimed would establish that the Government knowingly used perjured testimony of its witness Robert D. Vick to obtain his conviction. He supported his motion with affidavits and the Government offered counter-affidavits. By stipulation, the District Judge heard the motion on the original record of the criminal trial, affidavits, briefs and oral argument. The Court resolved the factual issues against Osborn in adopting findings of fact and conclusions of law and it denied the motion.

On appeal, in No. 17810, a panel of this Court, one judge dissenting, remanded the case to the District Court "for a full evidentiary hearing on the motion".

The Government filed a motion for rehearing of the appeal en banc, which was granted by the Court, three Judges dissenting. The opinion of the panel was withheld from publication and the mandate stayed pending the outcome of the rehearing en banc.

Upon the rehearing en banc, the Court was evenly divided both as to whether or not the case should be remanded for an evidentiary hearing and as to the procedural effect of an evenly divided vote after the rehearing.[1] Meanwhile, Osborn filed in the District Court a Title 28, Section 2255 motion to vacate sentence embodying in ground No. 5 thereof essentially the same allegations as were set forth in the second motion for a new trial. We ordered that the decision in the appeal in No. 17810 be held in abeyance pending receipt and incorporation into the record of the appeal, the testimony and findings of the District Court relevant to ground No. 5 of said Section 2255 motion.

Prior to the hearing of the Section 2255 motion, Osborn obtained extensive discovery by means of depositions and interrogatories. The District Court ordered his return from prison so that he could prepare for and attend the hearing.

The District Court conducted an evidentiary hearing on the motion on August 19, 20 and 21, 1968. The Court considered the motion on the original record, depositions, exhibits and oral testimony of a number of witnesses including Osborn. It again resolved the factual issues against Osborn. It adopted 30 findings of fact and 6 conclusions of law and denied the motion to vacate sentence. Osborn has appealed therefrom in No. 19124. The record in the Section 2255 hearing has also been filed in Appeal No. 17810 pursuant to our previous order.

The findings of fact and conclusions of law adopted by the District Court are appended hereto.

### The Alleged Erroneous Instruction

Osborn first contends that the District Court in the trial of the criminal case gave an erroneous instruction to the jury which operated to direct the jury to return a guilty verdict against him. Osborn made this same contention in his direct appeal. We noted in our opinion in that case that at the conclusion of the charge both sides stated that they had no exceptions to the charge given, 350 F.2d 497, 507, 508. Osborn was represented by experienced, able counsel. Osborn was an able trial lawyer with wide experience in trial and appellate courts, including extensive experience in the federal courts. He had served as City Attorney of Nashville and as Assistant United States Attorney for the Middle District of Tennessee. If the District Judge really had directed the jury to return a guilty verdict against Osborn, the objections to it, we believe, would have been loud and clear. Instead, not having taken any exception to the Court's instructions, as given, he relies on the plain error rule. Fed.R. Crim.P. 52(b).

In the direct appeal, we found no plain error in the Court's charge to the jury. We stated that considering the charge "as a whole and its paragraphs in proper context, we find the charge essentially fair." 350 F.2d at 508. We decline to change our ruling.

Since our decision was affirmed by the Supreme Court, Osborn should be precluded from litigating the identical issue which has been adjudicated against him. In any event, this issue can only be raised on direct appeal and is not properly the subject of a Section 2255 motion. Banks v. United States, 287 F.2d 374 (7th Cir. 1961); cert. denied, 366 U.S. 939, 81 S.Ct. 1668, 6 L.Ed.2d 850; United States v. Stevens, 260 F.2d 549 (3rd Cir. 1958).

---

1. The procedural aspects have now been resolved prospectively by the adoption of Rule 3(b) of the Rules of the Sixth Circuit Court of Appeals.

### The Sufficiency of the Evidence

Osborn in his direct appeal in this Court, and also in the Supreme Court, raised the question that what he did constituted no violation of the jury-tampering statute (18 U.S.C. § 1503). 350 F.2d at 503 and 385 U.S. at 332, 87 S.Ct. 429. This issue was also decided adversely to him by both courts. He now raises the same question in the present appeals, although in slightly different form.

Osborn contends that since this Court had granted a stay of proceedings in the Hoffa criminal trial pending Supreme Court review of a mandamus action filed by Hoffa against the District Judge, that the petit juror which Osborn endeavored to bribe was really not a prospective juror in the Hoffa trial.

The facts are that on July 29, 1963, the Hoffa case was set for trial in Nashville on October 14, 1963. On October 3, 1963, we granted the stay. The stay was terminated by the Supreme Court on November 12, 1963 when certiorari was denied in the mandamus action.

That Osborn expected a prompt adverse ruling by the Supreme Court in the mandamus action with a dissolution of the stay order and the assignment of the Hoffa case for trial is revealed in his recorded conversation on November 11, 1963 with Robert Vick whom he had instructed to offer a bribe to the prospective juror Elliot:

> " 'Osborn: Tell him [juror Elliott] it's a deal.
>
> 'Vick: It's what?
>
> 'Osborn: That it's a deal. What we'll have to do when it gets down to the trial date, when we know the date, tomorrow for example if the Supreme Court rules against us, well, within a week we'll know when the trial comes. Then he has has to be certain that when he gets on [the jury], he's got to know that he'll just

> be talking to you and nobody else.'
>
> \* \* \* \* \* \*
>
> 'Osborn: It will be a week at least until we know the trial date.' "

350 F.2d at 500, 502.

Osborn attempted to protect himself in his recorded conversation with Vick by stipulating that the prospective juror was not to get the bribe money unless he was accepted as a juror.

The facts as to the stay were brought out in Osborn's criminal trial and were before this Court on appeal. In our opinion in the direct appeal we said:

> "This Hoffa jury tampering case was originally scheduled to be tried in the United States District Court for the Middle District of Tennessee, Nashville, Tennessee, and it was expected that the jury panel for that District would be the panel from which the Hoffa, et al., jury tampering case would be chosen." 350 F.2d at 499.

■■ Elliott was on the jury panel expected to try the Hoffa case at the time endeavors were made to bribe him. The unlawful endeavors were not rendered lawful because the jury panel of which Elliott was a member did not eventually try the Hoffa case. Moreover, we have repeatedly held that the sufficiency of the evidence to support a conviction may not be collaterally reviewed on a Section 2255 proceeding. United States v. Shields, 291 F.2d 798 (6th Cir. 1961), cert. denied, 368 U.S. 933, 82 S.Ct. 371, 7 L.Ed.2d 196.

■ We are of the opinion that there was substantial evidence to support the conviction. The decision of the Supreme Court in Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960), on which Osborn relies and which was a direct appeal, is inapposite.

### The Alleged Perjury

The perjury alleged to have been committed by Vick related to his answers to questions affecting his credibility as a

witness. It was not on the subject of whether Osborn did endeavor to bribe a prospective juror in the *Hoffa* case which was the crime that the indictment charged Osborn with committing.

That Osborn did endeavor to bribe the juror was clearly established by his own admission that the transcript of the tape recording the conversation between Osborn and Vick containing his offer to bribe was "substantially correct."

Osborn's defense to the jury tampering charge was by way of confession and avoidance, namely, entrapment. The recorded conversation, however, had an important bearing on the issue of entrapment because of the assurance which Osborn instructed Vick to give to the juror Elliott:

"Osborn: You assure him of that. 100%.

"Vick: And to keep any fears down that he might have, see?

"Osborn: Tell him there will be at least two others with him." [2]

This followed the pattern in the first Hoffa trial where the endeavors were not merely to bribe a single juror, but a number of them. Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), rehearing denied, 386 U.S. 940, 951, 87 S.Ct. 970, 17 L. Ed.2d 880 (1967).

The District Judge who heard the Section 2255 motion had presided at the original trial of Osborn. He was able and experienced with many years of service as a trial judge. He heard the second motion for a new trial on newly discovered evidence in which Osborn made the same claim as he now asserts in his Section 2255 motion, namely, that the Government knowingly procured perjured testimony of Vick to obtain his conviction. The second motion for a new trial, by stipulation of the parties, was heard on the trial record of the criminal case supplemented by affidavits submitted by Osborn and a counter-affidavit submitted by the Government. The District Judge resolved the factual issues in favor of the Government and denied the motion. That the District Judge had the authority to decide the motion upon the affidavits was squarely held by the Supreme Court in United States v. Johnson, 327 U.S. 106, 111, 66 S.Ct. 464, 90 L.Ed. 562 (1946), and re-affirmed by this court in United States v. Hoffa, 382 F.2d 856, 864–865 (6th Cir. 1967), cert. denied, 390 U.S. 924, 88 S.Ct. 854, 19 L.Ed.2d 984.

The District Court had the opportunity in considering the Section 2255 motion to review the record of the original trial and of the motion for a new trial on newly discovered evidence, and to see and observe the witnesses who testified at the evidentiary hearing. We mention this because the issue as to whether known perjured testimony was used to convict Osborn is purely factual and, in our judgment, the District Judge is best able to pass upon the credibility of the witnesses who appeared before him.

The perjury alleged to have been committed by Vick was contained in his answers to questions propounded on direct and cross examination in which he was asked whether he or any member of his family had been paid any money or promised payment or reward by the Government for his testimony. His answers to the questions were to the effect that he had not been paid or promised anything by the Government. The complete questions and answers appear in the Findings of Fact and Conclusions of Law of the District Court which are appended hereto.

Osborn contends that Vick and his family received money and benefits from the Government prior to, during and subsequent to the trial and that his answers to the questions were false and known to be false by the Government. Included in the category of benefits is the claim that Vick received his policeman's salary of $358.00 per month from the City of

---

2. The complete transcription of the recording is appended to the opinion of the

Supreme Court, 385 U.S. 323, 333–340, 87 S.Ct. 429, 17 L.Ed.2d 394.

Nashville from November 11, 1963 until November 15, 1964 [3] during which time he was performing no service for the City but was assigned by the Chief of Police to the United States Marshal's Office. This was done pursuant to an order of Chief Judge William E. Miller placing Vick under protective custody for the protection of his life and he was guarded as a witness by the Marshals. The order of Judge Miller was not publicized at the time.

Osborn, however, knew that Vick was under protective custody and that he was receiving his policeman's salary from the City because Vick testified to that effect at the criminal trial. Since Vick admitted at the trial receiving his salary from the City, his answers to the questions can hardly be deemed perjurious. Further, the issue was fully explored at the trial and brought to the attention of the jury and it has no relevancy here.

It is apparent from the evidence, and the Court so found, that Vick as well as the Court and the Government attorneys understood the various questions propounded to Vick as inquiring whether he received any payment or reward from the Government as an inducement for his testimony. The questions were not understood as inquiring about reimbursement of expenses as a witness, or about reimbursement of expenses for travel to attend interviews with representatives of the Government or about expenses incurred in connection with protective custody.

As a former Assistant United States Attorney, Osborn was familiar with the practice of reimbursement of witnesses for expenses as well as the manner of handling witnesses under protective custody. If counsel really wanted to prove payment of witness fees and expenses they should have framed questions to elicit that information.

 In order to convict a witness of perjury, he must give testimony which he believes not to be true. 18 U.S.C.

§ 1621; United States v. Wall, 371 F. 2d 398, 400 (6th Cir. 1967). Vick could never be convicted of perjury on the evidence in this case because he, as well as the District Judge and the Government attorneys believed that the questions directed to him did not relate to the reimbursement of expenses.

The payment by the Government of $86.28 to the Holiday Inn in Nashville for one week's lodging of Vick while he was in protective custody during intense publicity resulting from Osborn's disbarment from Federal practice was found by the District Judge to be an expense item and not a reward for services. Likewise, the payment of $617.98 by the Government to Ryder Car Rental Company for use in transporting Vick and his family while in protective custody was found to be an expense item and not a payment or reward for service. In our opinion, both of these items should not be considered as payments to Vick as a reward for his service.

Prior to the Osborn trial, Deputy Marshal Irwin purchased two airplane tickets for transporting Vick and himself to Washington to confer with Walter Sheridan who was Special Consultant to the Attorney General and was in charge of investigating the Hoffa and Osborn cases. The Government reimbursed Irwin in the amount of $100.00 for out-of-pocket expenses. Vick received no part of the money. We agree with the District Court that Vick's testimony in so far as this matter is concerned was not perjurious.

We reach the same conclusion with respect to the payment of Vick's lodging at Holiday Inn in the amount of $192.43 while he was in protective custody during the Osborn trial.

Appellant contends that Vick received benefits in a trip to Washington which Vick and his family made about three weeks after the trial. The Government paid their travel and lodging expenses in the amount of $675.00.

---

3. It was increased to $400.00 per month July 1, 1964.

The District Judge made detailed findings of fact relative to this trip. He found that it did not result from a pretrial promise but because Vick had reported to Sheridan that there was a great deal of hostility against Vick in Nashville because he had testified against Osborn; that Vick and his wife had received numerous threatening telephone calls, and that efforts had been made to persuade Vick to change his testimony. Sheridan had received reports that two members of the Teamsters Union, who had cooperated with the Government, had been killed in Kansas City. Sheridan had a feeling of responsibility for Vick because Vick had testified for the Government in the *Osborn* case as a result of Sheridan's interview with him. Sheridan knew that Vick was poor; that Vick had known Osborn for a number of years; that Osborn had perviously employed Vick to investigate the jury panel in the *Hoffa* case, and Sheridan believed that Vick might be tempted to recant his testimony by offers of money. Sheridan remembered that Osborn offered testimony at the trial to the effect that Vick had endeavored to sell testimony favorable to Hoffa to representatives of the Teamsters Union. In view of all these facts, the District Court found it reasonable for Sheridan to bring Vick to Washington for discussions with the Department of Justice. The payment by the Government of the expenses of the trip, under these circumstances, can hardly be considered as a reward.

The District Judge gave no credence to out-of-court statements made by Vick to several persons during a period of five or six months after the trial for the purpose of selling a sensational magazine article. The Court found as a fact that neither Walter Sheridan nor any other representative of the Government before the trial promised Vick any future reward for his testimony.

Appellant attaches great significance to an uncompleted loan transaction which took place between Sheridan and Vick about six months after the trial when Sheridan was no longer with the Department of Justice. Vick had been calling Sheridan frequently on the telephone reporting that he was in desperate financial condition and unable to secure employment as a result of his testimony at the trial, and was being offered money to recant his testimony.[4] Sheridan suspected that feelings in Nashville were against Vick because of his testimony against Osborn who had been a high official in the local Bar Association. Sheridan knew that Osborn had not been disbarred in Tennessee although the Federal Court had disbarred him nearly five years ago. Vick asked Sheridan for a $3,000.00 loan and also for help in getting a job. Sheridan told Vick he would make the loan to help him in his financial difficulties and that he should come to Washington to discuss the efforts to get him to recant his testimony. Vick came to Washington and went to Sheridan's home.

Sheridan borrowed $3,000.00 in cash from his friend, Stephen Smith, Robert Kennedy's brother-in-law, without telling either Smith or Kennedy the purpose of the loan.[5] Sheridan gave the money to Vick on the same day he received it from Smith and he arranged for Vick to sign a promissory note on the following day at the office of Sheridan's lawyer in Washington. The lawyer advised Sheridan the next morning not to make the loan to Vick as it might be misunderstood. Sheridan took the money back from Vick and returned it to Smith. Sheridan explained the entire matter at

---

4. The Court found real basis for Sheridan's fears that Vick might recant. It found as a fact that James Harding, an administrative assistant to James Hoffa, sent a message to Vick through Earl Wingo that Vick would be paid $25,000.00 if he would change his testimony. Similar efforts were made by the International Teamsters Union through James Craighead.

5. Robert Kennedy was Attorney General at the time of Osborn's trial. He resigned on September 3, 1964, and therefore he was not Attorney General at the time of the alleged loan.

the hearing. The Court found that his explanation was true and that the uncompleted loan was not made pursuant to a pretrial promise.

Sheridan did ask Don Vestal who was President ·of an anti-Hoffa Local Teamsters Union and possibly Harold Humphreys, a Chattanooga lawyer, to help Vick get a job for basically the same reasons that prompted him to agree to make the $3,000.00 loan. The Court found that these requests were not made pursuant to a pretrial promise. The Court further found that Vick's present profitable connection with a Nashville insurance agency, which Vick incorporated, was not obtained by Sheridan.

While Sheridan's handling of Vick's loan has bizarre aspects, it must not be forgotten that Sheridan had been confronted with serious and troublesome problems and that he did not want to abandon and leave in a lurch the witness who had testified in favor of the Government.

At the evidentiary hearing, Osborn was asked upon cross-examination whether or not, after his indictment, he received $155,000.00 from Dauris Whittington of Natchitoches, Louisiana, which came off the top of a loan from the Teamsters' pension fund to Trinity Industrial Properties. Osborn refused to answer on the ground that it might incriminate him. The Court ordered him to answer but he again refused. Instead of citing him for contempt, the Court referred the matter to the President of the Nashville Bar Association for appropriate action.

At the evidentiary hearing, Appellant called nineteen witnesses. The Government called five witnesses. The Government's witnesses were the attorneys who prosecuted the *Osborn* case, the United States Marshal, Walter Sheridan and Vick.

 We have carefully examined the Findings of Fact of the District Court and find that they are supported by substantial evidence and are not clearly erroneous. Fed.R.Civ.P. 52(a). The clearly erroneous rule is applicable to post conviction proceedings. Anderson v. Johnson, 371 F.2d 84, 89 (6th Cir. 1966), cert. granted, 389 U.S. 819, 88 S.Ct. 109, 19 L.Ed.2d 69, judgment remains in effect, 390 U.S. 456, 88 S.Ct. 1194, 20 L.Ed.2d 27; Townsend v. Henderson, 405 F.2d 324, 327 (6th Cir. 1968); see also United States v. Yellow Cab Co., 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949).

Appellant's reliance on Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed. 2d 1217 (1959), and Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), is misplaced. In *Napue,* the prosecutor failed to correct testimony which he *knew* to be false. In *Mesarosh,* the Government moved the Court to remand the case because it had information that one of its witnesses had given untruthful testimony in other proceedings. In the present case, the Government made no such concessions. Osborn was unable to prove that the Government offered testimony which it knew to be false to obtain his conviction. The District Court found that no false testimony was offered by the Government.

It remains to be said that Osborn was not convicted on the basis of uncorroborated testimony of Vick. As well stated by the District Judge:

"He was convicted on the basis of his own voice as recorded on tape at his meeting of November 11, 1963 with Vick. The tape shows that at this meeting Osborn instructed Vick to contact a prospective juror in the case of United States v. Hoffa for the purpose of offering the juror a bribe."

Osborn has now had his evidentiary hearing which was the issue in No. 17810. Our opinion is therefore dispositive of both appeals.

The judgment of the District Court is affirmed in each case.

APPENDIX

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

(Filed September 5, 1968.)

In this action the court held a full evidentiary hearing on August 19, 1968 through August 21, 1968, and the following findings of fact and conclusions of law are made and adopted.

This is a civil action instituted by Z. T. Osborn, Jr., plaintiff, (hereinafter referred to as "Osborn") against the United States (hereinafter referred to as the "government") under Title 28, United States Code, Section 2255, to vacate his sentence of 3½ years confinement and $5,000 fine. This sentence was imposed because of his May 29, 1964, conviction for violating Title 18, United States Code, Section 1503 by endeavoring to bribe a juror in the case of United States v. Hoffa.

Osborn claims his sentence should be vacated for three reasons: (a) The trial court at his original trial erroneously directed a verdict of guilty, (b) The government knowingly introduced perjured testimony, and (c) The original indictment was false and the proof insufficient at his trial.

### FINDINGS OF FACT.

#### I. Allegation That Trial Court Directed Verdict.

1. On this issue the record shows that at the conclusion of the Court's charge in the Osborn criminal case both the government and Osborn stated that they had no objections to the charge. The record also shows that the same issue was raised in the Sixth Circuit Court of Appeals in his appeal from his original conviction. Precisely the same objection to the trial court's instructions was briefed, argued, and decided by the Court of Appeals, as the following excerpt from the opinion of the Court of Appeals indicates:

"In this case at the conclusion of Judge Boyd's charge both sides stated that they had no exceptions to the jury instructions as given. We have reviewed the claims of error in the charge as given which defendant's counsel now presents on appeal and find no example of 'plain error' therein. Rule 52(b) Fed.R.Crim.P. Taking the charge as a whole and its paragraphs in their proper context, we find the charge essentially fair." 350 F.2d 507–508.

2. The trial court in its instructions did not take from the jury the determination of the defense of entrapment, but rather left this issue for decision by the jury. Neither did the trial court state to the jury as a fact that in November 1963 "Osborn told Vick to go to Elliott, sit down with him, talk with him and get him on our side." The allegation contained in paragraph 4 of Osborn's 2255 motion that the court did make this statement to the jury as fact, rather than as a contention by one of the parties, is untrue, as the following excerpt from the court's charge makes clear:

With respect to the first count of the indictment, it is the *Government's contention* that in November of 1963 Robert Vick, who was still working for Osborn as an investigator, had conversation with Osborn during which he told Osborn that he had a cousin on the jury panel expected to try the Hoffa case in which Hoffa and six others were charged with jury tampering in the 1962 Hoffa trial. Upon being told that by Robert Vick, *Osborn told Vick to go see Elliott, sit down with him, talk with him and get him on our side.* Vick had previously been asked by Mr. Walter Sheridan of the Department of Justice to report to him any information he might receive of illegal activities of the defendants or their counsel and specifically to report only such illegal activities.

The Government *further contends* that when Osborn on November 7, 1963, asked Vick to contact his cousin Elliott, sit down and talk with him and get him on our side, he reported

this conversation to Mr. Sheridan of the Department of Justice, and on the next day signed an affidavit containing the substance of the conversation. (Emphasis added).

## II. The Perjury Issue.

1. In paragraph 5 of his 2255 motion, Osborn claims that the government knowingly introduced perjured testimony through its witness, Robert D. Vick, (hereinafter referred to as "Vick" or the "witness") in the prosecution of the criminal case against Osborn in May 1964. The Sixth Circuit Court of Appeals by its rulings on April 9, 1968, and June 10, 1968, ordered this court to conduct an evidentiary hearing on the perjury issue in this 2255 proceeding.

2. Osborn's contention that Vick committed perjury is directed to Vick's answers given at the trial to certain questions about whether the Government had paid or promised him anything for his testimony. There were two lines of examination at the trial relevant to this issue. The first line of questioning dealt with Vick's employment by the Nashville Metropolitan Police Department and his assignment or transfer to the United States Marshal's office as a result of his involvement in the *Osborn* case. Vick's testimony concerning this transfer was as follows:

Direct Examination of Vick by Mr. Hooker (Appellant's Appendix on Appeal in Plaintiff's Criminal Trial, Page 192a).

Q. And you have been with the Police Department? A. Yes, sir.

Q. Are you working with the Police Department at the present time? A. Yes, sir, I am employed by the Police Department.

Q. Are you on any particular assignment, on any special assignment? If you, what are your duties at the present time? A. I am on special assignment to the Federal Government.

Q. And are you still being paid your salary by the Police Department? A. Yes, sir; that is correct.

\* \* \* \* \* \*

Cross-Examination of Vick by Mr. Norman (Appellant's Appendix, pages 231a–232a).

Q. All right. I want to make sure I understand you on it. Now, Mr. Vick, are you still a metropolitan policeman? A. Yes, sir.

Q. When is the last time you did any work for the City? A. I believe it was in November, Mr. Norman.

Q. In November? A. Or—

Q. '63? A. Or maybe the last part of October.

2. How much do you make a month? A. $379, I believe it is. $358.

Q. That's take-home pay? A. No, sir, that gross.

Q. Have you been getting that all during these months? A. Yes, sir.

Q. You have been playing golf most of the time, haven't you? A. I have played some golf.

Q. Practically every day? A. Not every day.

Q. Two or three times a week? A. I have played golf.

Q. Have you done any work for the government since November, at any time whatsoever, or just waiting for this trial? A. No, sir.

Q. You haven't done anything for the city, but the city has kept paying you? A. Yes, sir.

Q. And you haven't done any work for the government. Have you done any work for anybody since November? A. No, sir, I don't believe I have.

Testimony of Vick on Motion to Suppress Evidence and Exclude Statement of Defendant. Direct Examination by Mr. Norman (Appellant's Appendix, pages 128a–129a).

Q. And what is your business? A. I am a policeman.

Q. With the Metropolitan—? A. Metropolitan Police Department, yes, sir.

Q. You have been actively engaged as a policeman? A. Yes, sir.

Q. Are you actively engaged as a policeman now? A. No, sir.

Q. Are you still on the Police Department? A. Yes, sir.

Q. Since when did you become inactive? A. I went—I am not exactly sure of the date, Mr. Norman, but it was in November I was put on special assignment to the Government.

Q. And have you done any work since that time for the Police Department? A. No, sir.

Q. Or for anybody else? A. No, sir.

Q. You have drawn your salary—? A. Yes, sir.

Q. —every month? A. Yes, sir.

The second set of questions on the issue of whether Vick was paid or promised anything was as follows:

Direct Examination by Hooker.

Q. Now, Mr. Vick, I want to ask you if at any time you or any member of your family have been paid anything by the United States Government? A. No, sir.

Q. Have you been promised to be paid anything? A. No, sir.

Q. By any representative of the Government? A. No, sir.

Q. Or have you been promised, aside from to be paid—promised to be given anything of value of any sort? A. No, sir.

Q. At any time? A. No, sir.

Cross-Examination, by Mr. Norman.

Q. *Can you recall any of the other places (you have seen Mr. Sheridan)?* A. Not offhand. I may have. *I saw him in Washington, D. C.*

Q. Now, then, Mr. Vick, as I understand you to tell Mr. Hooker, you have never accepted any money from the government and particularly the Department of Justice for the work you have done in this case? A. That is correct.

Q. Nor has any member of your family accepted any—I mean your immediate family, of course—any money from the United States Government, or anybody representing the government, or the Department of Justice, for your work, for you? A. No, sir, they have not.

Q. They have not? A. No, sir.

Q. Also I believe you told Mr. Hooker that you had never been promised any reward for your participation or work in this case? That is *right, is it not?* A. That's right.

Q. You have told him that you have never been promised any reward directly or indirectly by anyone for the government, or under its direction? A. That is right.

3. In order to insure his safety, Vick was placed in the protective custody of the United States by the United States Marshal upon the instruction of Federal District Judge William E. Miller. This instruction given to the Marshal about November 11, 1963, the date Vick recorded a conversation with Osborn in which Osborn directed Vick to endeavor to bribe a prospective juror in the pending case of United States v. Hoffa. The United States Marshal was instructed to decide how long Vick should remain in protective custody. Vick remained in protective custody and was guarded by United States Marshals from the middle of November 1963 until the middle of November 1964, a period of approximately one year.

4. At the time of his trial in May 1964, Osborn knew that Vick was in protective custody and had been in protective custody for more than six months because Vick so testified at the trial.

5. As a result the prosecution was entitled to assume that Osborn, a lawyer, a former Assistant United States Attorney who had handled many criminal cases in federal court both for the government and the defense, knew that the government would pay expenses incurred in connection with the protective custody of the witness, including expenses for transporting the witness and his family and housing the witness away from home when necessary.

6. Osborn knew at the time of the trial that arrangements had been made by representatives of the government six months before the trial for Vick to be transferred by his employer, Nashville Metropolitan Police Department, to the United States Marshal's office and further knew that from the time of such transfer until the trial the witness drew his normal police officer pay from the Police Department without performing his normal duties. The witness so testified at the trial. The witness made no effort to conceal his relationship with the Nashville Police Department or the United States Marshal's office and did not commit perjury about these matters.

7. Vick received his regular pay from the Nashville Police Department while assigned to and in the protective custody of the Marshal. The witness disclosed these facts to Osborn several times at the trial and at an April 15, 1964 pre-trial hearing. For example, Vick testified at the trial as follows:

### Direct Examination of Vick by Mr. Norman.

Q. Now, then have you been paid anything directly or indirectly by the Government, the Department of Justice in particular, for any work that you have done in connection with this case in any way, shape, form or fashion, directly or indirectly, to you or to your family? A. Now, that is a pretty long question, Mr. Norman.

Q. Well, it is pretty clear. A. I haven't received any money from the United States Government. Now—

Q. Who have you received money from? A. —From anybody that is connected with the United States Government.

Q. I mean, for doing this work. Who have you received money from? A. Nobody has paid me anything, Mr. Norman.

Q. As I understand you— A. Except the Nashville Police Department paid me my salary.

Q. All right, then. As I understand it, from the time you started this work in October, you have received no pay of any kind, shape, form or fashion, directly or indirectly, from the Government, or the Department of Justice, or through anyone who they authorized to pay you money? A. That is correct.

Q. And have you received any other income except your police money? A. No.

8. The additional questions asked Vick at the trial about whether he had been "paid or promised anything" by the government meant, "have you been paid or promised any *reward or profit* by the government as an inducement for your testimony" in addition to your police pay. The Judge in this 2255 proceeding was the presiding Judge at the trial, and he understood this to be the meaning of this set of questions. The witness and the lawyers for the government, according to their testimony at the evidentiary hearing, understood this to be the meaning of the questions. The questions were not understood by the Judge, the lawyers for the government or the witness to be inquiries about reimbursement of expenses as a witness, or inquiries about reimbursement of expenses for travel to attend interviews with representatives of the government, or inquiries about payment of expenses incurred by the United States Marshal in connection with protective custody.

9. Prior to Osborn's trial, the government paid $86.28 to the Holiday Inn in Nashville for Vick's lodging there from about November 16, 1963 to No-

vember 22, 1963, during which period Vick was in protective custody of the Marshal. Osborn's efforts to bribe a prospective juror through Vick were made public immediately prior to lodging Vick at the Holiday Inn. The purpose of lodging Vick at the Holiday Inn was to secure his safety during a period of intense newspaper and television publicity about the case. This publicity resulted from Osborn's disbarment from practice in federal court which occurred at this time. Neither Vick nor representatives of the government considered this expense payment to the Holiday Inn to constitute a reward for Vick's services. Vick, therefore, did not commit perjury with respect to this expense payment in connection with his protective custody.

10. Prior to the trial, the government paid to Ryder Car Rental Company in Nashville expenses in the amount of $617.98, covering Vick's use of a rental car from November 8, 1963 to January 16, 1964. Vick rented this car on November 4, 1963 on his own initiative in connection with his work for Osborn in investigating the background of prospective jurors in the case of United States v. Hoffa. Three days later, on November 7, 1963, the first discussion occurred between Osborn and Vick in which Osborn indicated his interest in bribing a prospective juror. Immediately after that conversation, on November 7, 1963, Vick notified representatives of the government of the conversation and conferred with them about the course of action to be followed. The next day, November 8, 1963 (the date from which the government paid for Vick's use of the car), a tape recorder was installed on Vick's person; and he returned to Osborn's office where there were further discussions between Osborn and Vick about bribing the prospective juror. The tape recorder did not function and the contents of the conversation were not recorded. Vick made another effort which was unsuccessful to contact Osborn between the meeting on November 8, and the meet-

ing on November 11, 1963, when the recording introduced at the trial was made. Vick used the rental car in connection with the gathering of this evidence. During this period Vick's activities were being monitored by agents of the United States.

11. Immediately following his November 11, 1963 discussion with Osborn, Vick was placed in the protective custody of the United States Marshal. The Marshal, according to his testimony at the evidentiary hearing, instructed Vick to retain the rental car in his possession to be used for transporting Vick and his family while in protective custody. Vick did not have an automobile in running condition at this time. Unless this arrangement had been made, the Deputy Marshal guarding Vick would have been required to chauffeur Vick and his family in the Deputy Marshal's automobile. When a witness is placed in protective custody, it is normal procedure in the Middle District of Tennessee, according to the testimony of the Marshal, to rent a car for the witness' transportation while in protective custody. According to the testimony of the Marshal, this same procedure has been followed in other cases where a witness has been placed in protective custody. It is more economical and convenient and interferes less with the privacy of the witness and his family.

12. This payment was a normal expense incurred in connection with securing the safety of the witness and his family. It is similar to other expenses incurred for this purpose by the Marshal: for example, the payment of the salaries and the expenses of the deputy marshals guarding the witness.

13. Prior to and during the trial, Osborn and his counsel knew that Vick was in protective custody and that these kind of expenses would be incurred and paid by the United States. Questions asked Vick at the trial about government payments and promises were not understood by the court, by the witness, or by counsel for the government as be-

ing intended to elicit answers about such matters.

14. The purpose of this payment of the expenses of the rental car used by Vick and his family, as in other cases where witnesses are placed in protective custody, was not to reward Vick for his services. Protective custody is normally a serious, although necessary inconvenience for a witness and his family. Neither Vick nor representatives of the Government considered this expense payment to Ryder Car Rental Company to constitute a reward for Vick's services. Vick, therefore, did not commit perjury with respect to this payment.

15. Prior to the trial on April 6, 1964, Vick and Jack M. Irwin, Deputy Marshal, were instructed by Elmer Disspayne, the United States Marshal, to travel to Washington to confer with Walter Sheridan, the agent of the United States Government in charge of investigating the Hoffa and Osborn cases. On that date Vick and Irwin did travel by plane to Washington where Vick conferred with Sheridan for three days, that is, until April 9, 1964, when Vick and Irwin returned to Nashville by plane. Irwin purchased the airline tickets for both Vick and himself for this trip at a cost of $176.00 and was instructed to pay out of his own pocket and keep account of the expenses incurred during the trip. On April 9, 1964, the United States, through Walter Sheridan, reimbursed Irwin in the amount of $100.00 for the out of pocket expenses he had paid for himself and Vick. Vick did not receive the money.

16. Neither Vick nor representatives of the government considered these expense payments for the trip to Washington to constitute a reward for Vick's services, and Vick did not commit perjury with respect to this matter.

17. During the trial Vick was lodged at the Holiday Inn in Nashville and after the trial the government paid expenses in the amount of $192.43 incurred for this lodging. The purpose of lodging Vick at the Holiday Inn during the trial was to secure his safety. Neither Vick nor representatives of the government considered this lodging to constitute a reward for Vick's services and Vick did not commit perjury with respect to this matter.

18. Neither Walter Sheridan nor any other representative of the government before the trial promised Vick any future reward for his services. Vick did make a series of unsworn, out-of-court statements to several persons that Sheridan entrapped Osborn and that Sheridan promised Vick a college education for his children, a job, money, and a vacation in exchange for his testimony.

19. These out-of-court statements by Vick were untrue and were made during a period of five or six months after the trial by Vick for the purpose of selling a sensational magazine article and for the purpose of inducing people to believe that he was an important person who could overturn the convictions of Osborn and Hoffa if he wanted to.

20. The court disbelieves these out-of-court statements for several reasons:

a. Vick has apparently made wild, untrue statements when not under oath on a number of occasions. For example, he has apparently said that he and Judge William E. Miller are friends and that he could influence Judge Miller to put his enemies in jail. Vick has apparently said that he could influence the local State District Attorney to do whatever he wanted him to do. Vick has apparently said that should Robert Kennedy be elected President, a friend of Vick's by the name of Don Vestal would be named Secretary of Labor and made President of the International Teamsters Union.

b. Each time Vick has been required to testify under oath about pre-trial promises of future reward, he has denied that any such promises were made to him. He has said that his contrary statements made out of court were untrue and not seriously intended. In a formal pre-trial examination on November 15, 1963, Vick denied that he was

promised anything by the government. He denied it at Osborn's trial. He denied it when he gave his testimony by deposition in connection with Osborn's disbarment proceedings in state court. He denied it on August 15, 1968, when his discovery deposition was taken in advance of the evidentiary hearing in this proceeding. He denied it at the evidentiary hearing.

21. In June 1964, three weeks after the trial of the Osborn case, Vick and his family traveled to Washington where they stayed for approximately one week. Their travel and lodging expenses in the amount of $675.00 were paid by the government. This trip was not promised to Vick in advance of the trial. Sheridan authorized this trip for two interrelated reasons. First, after the trial Vick and his family reported to Sheridan that they had received numerous threatening phone calls and that efforts were being made to get Vick to recant his testimony at the trial. At this time Sheridan received reports that two teamster members who were government informers had been killed in Kansas City. Sheridan was concerned for the safety of Vick and his family. Sheridan felt a high degree of responsibility for Vick and it was because of Sheridan's interviews with him that Vick became a witness in the *Osborn* case. Second, Sheridan also knew that Vick was a poor man who had known Osborn for many years and whose integrity was in doubt, and Sheridan believed that Vick might be tempted to recant his testimony by offers of money. During the trial in the original case, Osborn introduced evidence that Vick had made an effort to sell testimony favorable to Hoffa and Osborn to representatives of the Teamsters Union. In light of these circumstances, it was reasonable to bring Vick to Washington at this time for discussions at the Department of Justice.

22. After June 1964, Sheridan did not see Vick again for five months, and during this period had very little, if any, contact with him by phone. In November 1964 Vick began calling Sheridan frequently on the phone. In these conversations he reported that he was in desperate financial condition, in part as a result of his testimony at the trial, and could not obtain a job and was being offered money to recant his testimony. Sheridan suspected that feelings in Nashville in some quarters were against Vick because of his testimony and knew that Osborn, who had been a high official in the Nashville Bar Association, had not been disbarred by this time, one year after the facts about Osborn's attempt to bribe a prospective juror had been made public. (Up to this time, August 1968, Osborn has not been disbarred from the practice of law in the State of Tennessee, although he was disbarred from practice in the federal court four years and nine months ago.) During these conversations in November and early December 1964, Vick asked Sheridan to loan him money and help him get a job. These calls persisted. In early December 1964 Sheridan told Vick he would loan him $3,000 to help him out of his financial difficulties and asked him to come to Washington to get the money and to discuss efforts being made to get him to recant his testimony. During the week of December 14, 1964, Vick came to Washington for this purpose. Sheridan himself borrowed the $3,000 in cash, the same day he gave it to Vick from a personal friend, Stephen Smith, Robert F. Kennedy's brother-in-law, without disclosing to Smith the purpose of the loan and without advising Robert F. Kennedy about the matter.

23. Sheridan then loaned the money to Vick at Sheridan's home and made arrangements for Vick to sign a promissory note the next morning at the office of Sheridan's personal lawyer in Washington. The next morning the lawyer advised Sheridan not to loan the money to Vick because such a loan might be misconstrued, and Sheridan took the money back and returned it to Smith.

24. Sheridan admitted at the evidentiary hearing the events surrounding

the $3,000 loan. The court finds that Sheridan's explanation of the loan is true and that it was not made pursuant to a pretrial promise.

25. Subsequent to the $3,000 loan, Sheridan attempted to assist Vick by asking Don Vestal (President of an anti-Hoffa local Teamsters Union in Nashville) to try to help Vick get a job. Sheridan may have also asked Harold Humphreys, a Chattanooga lawyer, to assist Vick in getting a job. The reasons Sheridan tried to assist Vick in getting a job are basically the same reasons that Sheridan loaned Vick the $3,000 which reasons were explained in paragraph 22 above. These requests were not pursuant to a pretrial promise. Vestal was not a conduit, instrument or agent for Sheridan to carry out pretrial promises to Vick.

26. Sheridan did not obtain for Vick his present employment as a partner in a Nashville insurance agency which handles the accident and health insurance for Vestal's local union.

27. Sheridan did not obtain money for Teamsters Local 327 or for Don Vestal either to pass on to Vick or for any other purpose, and did not reimburse Vestal for money paid by him or by the union to Vick when Vick was employed by the union after the Osborn trial.

28. Attempts were made by agents of the International Teamsters Union after the Osborn trial to get Vick to recant his testimony. One, James Harding, for example, administrative assistant to James R. Hoffa, sent a message to Vick after the trial through Earl Wingo that Vick would be paid $25,000 if Vick would change his testimony. Similar efforts were made by agents of the International Teamsters Union through James Craighead.

29. Sheridan's belief that efforts were being made to corruptly influence Vick to change his testimony has a basis in fact, and Sheridan's frequent telephone contacts with Vick after the Osborn case from November 1964 until the present time were reasonable in light of the circumstances and not pursuant to any pretrial promises to Vick by Sheridan or other agents of the government.

30. Osborn was not convicted at his May 1964 trial on the basis of Vick's uncorroborated testimony. He was convicted on the basis of his own voice as recorded on tape at his meeting of November 11, 1963 with Vick. The tape shows that at this meeting Osborn instructed Vick to contact a prospective juror in the case of United States v. Hoffa for the purpose of offering the juror a bribe.

### III. Variance Between Indictment and Proof.

1. In paragraph 6 of his 2255 motion, Osborn asserts that there was a variance between the indictment and the proof in his original trial and that the indictment was false in that Ralph A. Elliott, the man Osborn attempted to bribe, was not a member of the jury panel from which the jury to hear the case of United States v. Hoffa was to be drawn. On the basis of the record in the case, the court finds that the case of United States v. Hoffa was pending for trial in the U. S. District Court for the Middle District of Tennessee in November 1964 and that Elliott was, and was known by Osborn to be, a member of the jury panel from which the jury in that case would be drawn.

### CONCLUSIONS OF LAW.

1. Allegations like those contained in paragraphs 3, 4 and 6 of Osborn's motion to vacate, that is, that the trial court improperly instructed the jury, that the indictment was false and that the proof was insufficient, are legally insufficient for relief under 28 U.S. Code, Section 2255. Such allegations are not cognizable in 2255 motions and must be raised upon appeal from the original conviction. For this reason, the claims stated in paragraphs 3, 4

and 6 of Osborn's motion must be dismissed.

2. The Court does, however, reach the claims stated in paragraphs 3, 4 and 6 of the 2255 motion on the merits and is of the opinion that the allegations contained therein are not supported by the record and have not been established by a preponderance of the evidence. The court is of the opinion that the preponderance of the evidence establishes that these allegations are untrue.

3. Where in a criminal case the prosecution intentionally introduces or fails to correct testimony of a witness which it knows to be false, a defendant convicted on the basis of such testimony is entitled to a new trial.

4. If the testimony of Robert Vick that the government did not pay or promise him any reward for his services was false and known to be false by the prosecution, then Osborn would be entitled to a new trial.

5. Osborn's motion to vacate sentence under 28 U.S.Code, Section 2255, is a civil action. The burden of proof rests with the plaintiff who in this case was the defendant, Osborn, at the May 1964 criminal trial. Osborn is required to establish the material facts supporting his allegation by a preponderance of evidence as in other civil cases. The measure of persuasion in a civil case charging fraud and perjury is stricter than in the normal civil case. Such allegations must be proved beyond a "preponderance of the evidence" by "clear and convincing evidence." Lalone v. United States, 164 U.S. 255, 17 S.Ct. 74, 41 L.Ed. 425 (1896); United States v. American Bell Telephone Co., 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144 (1897); Bowen v. B. F. Goodrich Co., 36 F.2d 306 (6th Cir. 1929); Bukowski v. United States, 136 F.Supp. 91 (S.D.Tex.1955); 9 Wigmore, Evidence, Sec. 2498 (3rd Ed. 1940). The plaintiff in this proceeding has not proved the allegations of perjury by either a preponderance of the evidence or by clear and convincing evidence. On the other hand the government has disproved the allegations of perjury by clear and convincing evidence, and the court, therefore, denies Osborn's motion to vacate on the grounds of perjury contained in paragraph 5 of his motion.

This 4th day of September 1968.

MARION S. BOYD,
United States District Judge.

### JUDGMENT.

(Filed September 11, 1968.)

In this action pursuant to the court's findings of fact and conclusions of law filed on September 5, 1968, it is hereby ordered and adjudged:

That the relief sought by the complaint be, and the same is hereby, denied; and that the Plaintiff's action be, and the same is hereby, dismissed.

The said findings of fact and conclusions of law shall be taken as constituting the court's findings of fact and conclusions of law in this action.

Each party shall bear his own costs.

MARION S. BOYD,
United States District Judge.

\* \* \*

### ORDER.

(Filed September 25, 1968.)

Plaintiff, Z. T. Osborn, Jr., has moved the Court to amend its findings of fact and conclusions of law heretofore filed on five particular points with respect to which the Court finds as follows:

(1) With respect to the first proposed amendment, the Court adds to paragraph 3 of the findings of fact on page 7 thereof the following sentence: "The primary purpose of Vick's assignment to the U. S. Marshal's office was to place him in protective custody and the use of the phrase 'special investigator' by the U. S. Marshal on February 19, 1964 and March 12, 1964 does not alter this fact."

(2) With respect to the second proposed amendment, the Court adds to

paragraph 21 of the findings of fact on page 15 thereof the following sentence: "These circumstances indicate clearly that the $675 payment was made *in connection with* the acquisition of information used as evidence in the *Osborn* case and further that the money was not a payment to Vick for evidence or testimony pursuant to a pre-trial promise."

(3) The Court finds that paragraphs 22, 23 and 24 of the findings of fact (which paragraphs refer to Sheridan's testimony and finds it to be true) cover the facts with respect to plaintiff's third proposed amendment.

(4) Plaintiff's proposed amendment No. 4 is covered by the facts found in paragraph 15 of the findings of fact which facts the Court finds to be consistent with Sheridan's affidavit of December 23, 1965.

(5) Plaintiff's proposed amendment No. 5 is covered by paragraph 1, page 19, of the findings of fact.

MARION S. BOYD,

United States District Judge.
9–24–68.