UNITED STATES of America,
Plaintiff-Appellee,

v.

James R. HOFFA, Thomas Ewing Parks,
Larry Campbell, and Ewing King,
Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Ewing KING, Defendant-Appellant.

Nos. 20271, 20272.

United States Court of Appeals,
Sixth Circuit.

Jan. 21, 1971.

See also, 7 Cir., 436 F.2d 1243.

Morris A. Shenker, St. Louis, Mo.
(James P. Hoffa, Detroit, Mich., Harvey

M. Silets, Chicago, Ill., Cecil Branstetter, Nashville, Tenn., Jacques M. Schiffer, Rockville Center, Long Island, N. Y., on the brief), for appellants Hoffa, Parks and Campbell.

Moses Krislov, Cleveland, Ohio (Harold E. Brown, Brown & Frazier, Chattanooga, Tenn., on the brief), for appellant King.

Robert J. Rosthal, Dept. of Justice, Washington, D. C. (Will Wilson, Asst. Atty. Gen., Jerome M. Feit, Michael T. Epstein, Attys., Dept. of Justice, Washington, D. C., John L. Bowers, U. S. Atty., Chattanooga, Tenn., on the brief), for appellee.

Before PECK, McCREE and BROOKS, Circuit Judges.

BROOKS, Circuit Judge.

In March of 1964 defendants-appellants, James R. Hoffa, Thomas Ewing Parks, Larry Campbell and Ewing King, were convicted for endeavoring to influence, impede and intimidate jurors in the discharge of their duties. (18 U.S. C. § 1503—The Federal Obstruction of Justice Statute). The alleged jury tampering involved attempts by these defendants to influence jurors who served on a case in which Hoffa was a defendant—the Test Fleet Case. Following the convictions for jury tampering, appellants filed motions for new trial which were denied and each conviction and the denial of the motions for new trial were affirmed by this Court, United States v. Hoffa, 349 F.2d 20 (6th Cir. 1965), affirmed 385 U.S. 293, 87 S. Ct. 408, 17 L.Ed.2d 374 (1966), reh. denied 386 U.S. 940 and 386 U.S. 951, 87 S.Ct. 970, 17 L.Ed.2d 880 (1967). A second group of motions for new trial were filed by appellants and denied. See United States v. Hoffa, 247 F.Supp. 692 (D.C.1965), affirmed 376 F.2d 1020 (6th Cir. 1967), cert. denied 389 U.S. 859, 88 S.Ct. 102, 19 L.Ed.2d 124 (1967). Appellants then filed a third round of motions for a new trial alleging newly discovered evidence. These motions were also denied, United States

v. Hoffa, 247 F.Supp. 692 at 698 (D.C. 1965), affirmed 382 F.2d 856 (6th Cir. 1967), cert. denied 390 U.S. 924, 88 S.Ct. 854, 19 L.Ed.2d 984 (1968). Finally, a fourth group of motions for new trial were filed, and it is a result of these motions that this case comes to us for review. This fourth attempt to obtain a new trial was denied by the District Court, United States v. Hoffa, 268 F. Supp. 732 (D.C.1967), and affirmed by this Court, 398 F.2d 291 (6th Cir. 1968). Appellant King did not perfect an appeal from the denial of his fourth motion for a new trial. After this Court affirmed the last denial of the motions for a new trial, 398 F.2d 291 (6th Cir. 1968), a certiorari petition was filed in the United States Supreme Court. While this certiorari petition was pending, the Solicitor General of the United States, complying with the Supreme Court's decision in Kolod v. United States, 390 U. S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968), disclosed that "although none of these petitioners was ever the subject of electronic surveillance directed against him two of the petitioners did participate in conversations which were monitored during the course of electronic surveillance directed against others." The Supreme Court then granted certiorari, set aside the judgment of this Court, and remanded the case to the District Court to determine "whether the surveillances at issue were unlawful." See, Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969).

While the Supreme Court's remand order applied to only appellants Hoffa, Parks and Campbell, the District Court permitted appellant King to participate in the remand hearing treating his motion as a petition for habeas corpus. At the time of the remand hearing, all appellants except Hoffa had completed serving their sentences. After a six day evidentiary hearing to determine the lawfulness of the surveillance, the District Court concluded "that no violation of any defendant's rights has been shown under the direction given by the

United States Supreme Court in Giordano v. United States" and affirmed the convictions and sentences imposed upon the defendants. See, United States v. Hoffa, 307 F.Supp. 1129 (D.C.1970). It is from this ruling that appellants have now appealed. As can readily be seen, the history of this litigation is long and involved. However, on this appeal we are only presented with the question of the correctness of the District Court's ruling on the legality of the electronic surveillances, and we affirm that determination.[1]

The electronic surveillances in these cases were accomplished by wire tapping of telephones and "bugging" (strategic placing of an electronic receiving device so as to overhear the conversation of individuals within proximity of the device). The Hoffa surveillances consisted of four "buggings" of the executive offices of two gambling casinos in Las Vegas, Nevada, and three monitorings of radio telephone conversations over special FM frequencies in Detroit, Michigan. The District Court concluded that these surveillances did not violate the rules established in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441 (1963), as to surveillances accomplished by means of trespass, and none of appellant Hoffa's constitutional rights were violated.

Appellant Campbell's surveillance consisted of some 254 monitorings of radio telephone conversations. These monitorings were accomplished by simply listening in on a special FM frequency that the Teamsters Union used in transacting business by radio telephone. The District Court concluded that since anyone with an FM receiver could have heard these conversations, there was no violation of appellant Campbell's Fourth Amendment rights.

There were no electronic surveillances of appellant Parks, and the thrust of his argument on this appeal is that the surveillances of Hoffa, Campbell and King, if illegal, in some way violated his constitutional rights. This same argument is made by appellants Hoffa and Campbell with respect to the surveillances of appellant King. On this appeal, neither Hoffa nor Campbell challenge the District Court's ruling on the legality of their respective surveillances, but rather question the correctness of the District Court's ruling on the legality of King's surveillance. Since it is concluded that the King surveillance was legal, it is not necessary to reach the issue of whether appellants Hoffa, Campbell and Parks have standing to raise alleged violations of appellant King's constitutional rights.[2]

1. The limited scope of appellate review in this case is dictated by the Supreme Court's remand order in Giordano v. United States, 394 U.S. 310, 312–313, 89 S.Ct. 1163, 1165, 22 L.Ed.2d 297 (1969). There it was spelled out that since "[i]t is not evident from the records * * * whether the surveillances at issue were unlawful * * * 'the District Court must develop the relevant facts and decide if the Government's electronic surveillance was unlawful.' Of course, a finding by the District Court that the surveillance was lawful would make disclosure and further proceedings unnecessary." The newly discovered facts developed during the remand hearing and referred to in Judge McCree's opinion concurring in part and dissenting in part are not properly before us, see United States v. Beal, 404 F.2d 58 (6th Cir. 1969), cert. denied

393 U.S. 1084, 89 S.Ct. 869, 21 L.Ed.2d 778; United States v. Aguillar, 387 F.2d 625 (2nd Cir. 1967), and appropriate procedures which are to be originated in the District Court are available if appellate review of these matters are sought. See, Rule 33, Federal Rules of Criminal Procedure.

2. Appellant Hoffa's right to raise alleged violations of appellant King's constitutional rights also stems from the fact that Hoffa was indicted and convicted as an aider and abettor of King for jury tampering. Because of this fact, Hoffa may have more of a concrete right than Campbell or Parks to raise questions about the validity of the King surveillance. However, as we conclude that the surveillance was legal, we do not reach this question.

There was only one electronic surveillance (a "bugging") of appellant King, and it is this surveillance appellants argue was unlawful. An associate of the appellants who was also a government informant had his automobile wired with an electronic receiver and tape recorder. The informant arranged a meeting with appellant King and the two men rode around Nashville, Tennessee, in the informant's automobile engaging in a ninety minute conversation which was taped.

■ Appellant King raises several constitutional challenges to this surveillance. First, it is alleged that the surveillance violated his Fourth Amendment right to be free of illegal searches and seizures. The taping of the conversation between the government informant and King took place with the consent of the informant, see, Kaufer v. United States, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (1969); Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L. Ed. 1270 (1952); cf. United States v. Osborn, 350 F.2d 497 (6th Cir. 1965), affd. Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); and was not the by-product of a trespass onto appellant's premises, see, Alderman v. United States, 394 U.S. 165, 171–176, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Cf. United States v. Hoffa, 349 F.2d 20, 48 (6th Cir. 1965). Thus, under existing Supreme Court interpretation, it cannot be said that King's Fourth Amendment rights were violated by the fashion in which this electronic surveillance was accomplished.

■ Second, King alleged that his Fifth and Sixth Amendment rights were violated by the government's surveillance of this conversation. It is argued that the surveillance was constitutionally impermissible because it resulted in his giving evidence against himself without being advised of his Fifth Amendment rights or his right to assistance of counsel. The difficulty with appellant's challenges to the surveillance on Fifth and Sixth Amendment grounds is that they require an unwarranted extension of existing case precedents. Respecting the claim of violation of appellant's Fifth Amendment right, present case law, notably Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires some element of compulsory self-incrimination. Here there was neither an in-custodial interrogation nor any compelling pressure applied which forced appellant to incriminate himself. See also, Hoffa v. United States, 385 U. S. 293, 304, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Furthermore, appellant's attack on the surveillance based on alleged violation of his Sixth Amendment right to assistance of counsel does not find support in present case law. See, Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). In *Escobedo* there was an in-custodial interrogation *after* arrest without assistance of counsel and in *Massiah* the surreptitious surveillance took place *after* indictment following Massiah's retention of counsel, pleading not guilty to the charge for which he was indicted and his release on bail. In this case the surveillance of appellant King took place the day preceding his indictment. An argument similar to appellant's based on the contention that at the time of the surveillance he was "a virtual defendant" was made by appellant Hoffa in the initial appeal of this case and rejected by the Supreme Court. See, Hoffa v. United States, 385 U.S. 293, 309, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Accordingly, it is concluded that appellant King's Sixth Amendment right to assistance of counsel was not violated by the surveillance in this case.

■■ Appellant also maintains that government non-disclosure of the surveillance and recording of the conversation at the original trial constituted suppression of material evidence under the rules recognized in Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), and Brady v. Maryland, 373 U.S.

83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). At the evidentiary hearing upon remand by the Supreme Court, the District Court reviewed the transcribed text of the conversation and concluded that "while portions of the recording do relate to the case, they are neither of an incriminating nor an exculpating nature." (Appended to this opinion is the text of the conversation.) A reading of the *Brady* decision indicates that suppression of evidence following request for disclosure violates due process "where the evidence is material either to guilt or to punishment, * * *" Brady v. Maryland, 373 U.S. 83 at 87, 83 S.Ct. at 1197. Independently reviewing the conversation, we agree with the District Court's conclusion that the conversation was neither of an incriminating nor exculpatory character requiring disclosure.

■ The last argument raised by appellant is that non-disclosure of the surveillance at the original trial, following a request for production of all electronic surveillances, violated 18 U.S.C. § 3500 —The Jencks Act. The simple answer to this contention is that 18 U.S.C. § 3500 applies to production of statements "made by a Government witness or prospective Government witness (other than the defendant) to *an agent* of the Government * * *." (Emphasis added). The recorded conversation between appellant King and the government informant is simply not a statement made "to an agent of the government." See, United States v. Sopher, 362 F.2d 523, 526 (7th Cir. 1966), cert. denied 385 U.S. 928, 87 S.Ct. 286, 17 L.Ed.2d 210 (1966).

The judgment of the District Court is affirmed.

## APPENDIX

### UNITED STATES DISTRICT COURT
#### EXHIBIT No. 12
#### TRANSCRIPTION OF TAPE RECORDING

King: Ed, I'm sure glad you came out of that damn thing down there.

Partin: Picked that damn paper up there and read about the thing coming up tomorrow, and get a book and it's in the book. Which way you?

King: Go straight on down.

Partin: Who is that fellow Tibbens or Tippens mentioned in that book?

King: He's the one that came in here and reported to the Judge while they were trying to select a jury that he had been offered some money and that, that, and the other.

Partin: What does he do?

King: * * * I don't think he does anything, Ed.

Partin: * * * do you reckon they got enough to bring out some indictments on that thing up there?

King: I don't know. I doubt seriously that with a story like this in here that they will bring indictments. There's a little piece in the paper today, I don't know whether you saw it or not, saying the grand jury would have to meet to return indictments.

Partin: Damn if they didn't have you.

King: They shore got me in there haven't they?

Partin: The only thing they missed was where you were going hunting so they must not give the whole story, must have added a lot together.

King: The truth of the matter is, Ed, the night I went down to this place, went down there and met with this Mutt Pitts and went to his house * * * and when you come right down to it, now this is the actual facts, I told my wife I had to go to Mutt's place; that we were going to arrange for a rabbit hunt Thanksgiving. I wanted to try out this old car I got off George anyway to see whether it was any good or not. When we got down there, this old boy's wife's daddy is real bad sick, but he's a real good friend of mine, real good, and we sat up there and drank coffee and had some cokes for a while. This old boy said we ought to be able to see him in a few minutes, I'll go down and see

and get some Coca Colas. When he came back he said this old boy wants to see you after while. He wants to get a promotion. He has been on the patrol 12 years. So we talked, and we talked, and we made him talk, or I made him talk. And then, I don't know whether he has changed his story or not. They say that he has, but this story in the magazine says he hasn't. The magazine is still writing the same story that he gave before the damn court up there. So, I don't know whether he has or whether he hasn't, but in view of this very thing during this time and many many other times the record will prove that I have been to every one of them suckers, these boys at one time or another to get promotions for these guy. So, hell fire, I talked to the Governor the other day. He said I'm so glad that Jimmy Hoffa beat them * * *. He sure did. I talked to the Chief of Police last night, right over there, and he said I'm so glad that Hoffa outsmarted everybody up there * * *. That's about all I've heard recently.

Partin: Do you think that if they got indictments they can convict anybody here * * *?

King: I doubt it very seriously. I doubt it very very seriously. I sure do. I'm going to get me a lawyer and beat their ass. There's one here in town that can beat any of them—Jack Norman. I'll get him.

Partin: How, look this fellow that they called. Do you know Tweel?

King: (Unintelligible, but apparently a negative reply.)

Partin: Do you think that highway patrolman will stay put?

King: I have always believed he would stay put. However, there have been a lot of rumors circulating around that he has changed his story from what he hold the Court because he was afraid and all this, that and the other but I do not believe he has done it. And I don't see how anybody else would know it either, you know, unless they've been in there. So, as far as I am concerned

there's, and Jim, I been in Philadelphia with him for a week, every day, he don't believe that they will even get any indictments, not after this long period of time. Five months have gone by.

Partin: Speaking of Chuck, I don't know how to figure Chuck. On night we were coming from O'Brien's in a cab, and he drove around and around and around and all of a sudden jumped out, said I'll see you later, and got in an old two tone Buick. Acted like he was scared to death.

\* \* \* \* \* \*

Partin: I read in the paper about that damn longshoreman * * *.

King: I am not convinced that they can get a conviction on me or anybody else since they have taken as much time as they have. If it takes them that long for them to get us, it will take them a damn sight longer to make them stand up.

Partin: Is Jimmy worried?

King: Don't seem to be, a bit.

Some talk here about Fields.

Partin: What's he doing now? (Believed to refer to Don Vestal).

King: Nothing that I know of. Was with steelworkers last account I had of him. They made me put him back and I'm fixing to put him back out on the * * * as soon as I can have a board meeting.

Partin: He don't come to the hall, or nothing?

King: He comes to the meetings but he won't stay but about 15 or 20 minutes. I start lowering the boom on his ass and he will leave right away.

Some talk here about where Vestal lives—talk about some grievance and about somebody retiring. Some speculation as to whether Vestal lives on Grandview Drive or Avenue.

King: If that highway patrolman stays put, they ain't got a thing.

Partin: What about that little fellow * * *?

King: Who went with me? He's just as solid as that bus up yonder. Yes sir, I was down to his house just a little while back. Me and my wife were down there Sunday evening. That's when I called up the Marshal and told him I was going down there and if he wanted to go he wouldn't have to drive his own car, he could go with me.

Partin: You know where they sell General tires? I need me one on the left front wheel.

King: There's one down on Broad Street.

Some talk about a union election lost by Teamsters to Steelworkers.

King: Those fellows up yonder (meaning Philadelphia), they damn near run me crazy. That was a rough deal up there. One boy went wild, he went all to pieces. One of our men. * * *

Partin: Wonder how many indictments they will come out with?

King: They will either come out with a real small amount, Ed, or they will get a whole damn bunch of us. I'm convinced that they are going to indict me, a boy out of Detroit Larry Campbell, Chuck, Hoffa, and maybe at least three more. * * *

Partin: Looks to me like they will have a rough time getting a Judge who doesn't know all about this thing.

---

Partin: How will Broda stand up?

King: He's all right. Ed, he don't know a thing.

Partin: Does he know anything about me at all?

King: No, sir, Ed, he don't know a thing in the world about me. As far as he knows the night we swapped cars we swapped for the purpose of him trading for the Thunderbird and me taking his car. That's all he knows now. I wouldn't have, you see I knew how weak he was. If somebody hit him over the head with a blackjack he would sing the star spangled banner * * *

Partin: I believe Twell is the weak link in this thing. I always will believe it.

King: Do you reckon?

Partin: He hasn't come around. He told me he wanted me to meet him in Miami; that he would call me and he ain't called me yet.

King: I guess I remember the man, but I can't place him.

King: I have another man here who is really giving me all the trouble he can * * * Perry Canaday, that served that workhouse sentence about four years ago on the barber shops. He works with Super Service. He's telling everybody he can run into he hoped they put me in the penitentiary. He's mad at me because I would not hire him. I couldn't hire him on account of his record, if I wanted to. I did not want to in the first place because he is stupid. He's beating his gums everyday and one of these days I am going to have to knock him on his ass myself, as sure as God made little apples * * *

Partin: Didn't you see them damn cars following you like that book said?

King: Well, they didn't follow me period they were watching Paschal's home and once they saw this car with Nashville license in the driveway of this Paschal's home, then's when they turned to the * * * You see they hadn't seen me. That is the reason you know the magazine said they put these spotters out to watch me when I got home to make sure I was driving that car because they did not put me in that car down there. They didn't follow me to Woodbury. They were watching Paschal's house and when Mutt Pitts took my car and went down there to get some coca colas and went by James Morris' house to see whether he had come in or not, that's when they got suspicious and wondered who was driving the car and everything.

King: Pull up on that rack right there. I used to know an old boy out here. Don't know whether he is still out here or not.

(Apparently stopped at McDowell General Tire Service and had a tire put on front wheel. Were out of the car most of the time.)

King: Okay Bob, good to see you.

Partin: Man, that saved me $18.00.

King: We could go back out this way and hunt that house up for sure * * * It's 1012 instead of 1211.

Partin: You all had a lot of fun in Philadelphia?

King: * * * I talked to Jim for an hour and a half. I told him I was going back to Tennessee; that I had a flight out the next morning. They are two hours faster than we are. I got home in time to do a day's work. We stayed up so damn much up there, day and night. I got a cold and I ain't been able to throw it off yet.

Partin: His spirits were pretty good after that?

King: Oh year * * * After the vote came in, we went down to the union hall.

Partin: Didn't they indict Chuck up there?

King: Hell yes, we talked about that. Jim said it wouldn't count up. Indicted him on that car and that damn ship deal. A convoy off a ship or something or other. Of course, he's an eager beaver * * * He shakes down every operator that he has anything to do with * * * He told me this himself.

Partin: That's what hurts us, things like that.

———————

Partin: Bufalino told me Campbell got messed up with some whores up there * * *

King: Is that right?

Some talk of Jimmy giving someone two minutes to get out of town. Some more talk about Campbell. King indicated he saw Campbell in Detroit and Campbell said he had tried to call King when he was in Nashville for the grand jury.

Partin: What about that fellow Bell, did I ever meet him?

King: I don't know. I didn't, Ed, I probably saw him.

Partin: He must have gone crazy on that damn phone, the way the paper talked.

King: Most of his calling was from out of town though, it wasn't in town. He called Tenpenny, Mutt Pitts and this highway patrolman and everybody else.

Partin: Did he know them?

King: He was trying to buy a race horse.

Partin: You are talking about that guy on the jury?

King: No, that official—that long-shoreman, Bell.

King: He called them from Memphis and everywhere he stopped.

Here, they apparently located a house at 1012 Grandview Avenue. King gave Partin instructions as to how to go out of town, by going out Granny White Pike. King said something about having called Dick Farrel.

King: Jim, he's been just jam up with me.

Partin: You went all out for him. He ought to be.

King: He told somebody up in Philadelphia the other day, this is Ewing King, said he helped me down in Nashville more than anybody will ever know.

———————

Partin: I laughed that morning you told Jimmy that woman would sit there til hell froze over.

King: That would have happened.

Partin: That was on account of kicking that woman off?

King: Yep.

Partin: He brightened up too, didn't he?

King: Yes.

———————

King: He (apparently referring to O'Brien) told me more lies than you ever heard tell of. He said his Daddy got killed on a picket line. Jimmy raised him up since he was three years old. I was putting up with a lot of bull.

Partin: Why did Jimmy get messed up with him?

King: Family obligations ⁕ ⁕ ⁕

Partin: Why did he get messed up with that stuff on the ship?

King: Ed, that's just one of those things ⁕ ⁕ ⁕ He gets himself into everything that comes along.

Some talk here about John J. Hooker, Sr. and John J. Hooker, Jr.

King: Miller (possibly referred to judge William E. Miller, U. S. District Court) hates me with a passion.

Partin: Who don't he hate?

King: I haven't lost a thing with him, so that feeling is mutual.

Here, they exchanged pleasantries, said good-by.

McCREE, Circuit Judge (concurring in part and dissenting in part).

I concur in the opinion of the court insofar as it affirms the District Court's ruling on the legality of the electronic surveillance employed in the investigation of this case. However, the fact, revealed for the first time during the hearing on remand, that Edward Partin participated in the recording of a conversation between Partin and King while they were seated in Partin's automobile raises a serious question whether the Government knowingly used perjured testimony in the original trial. Partin testified, on a motion to suppress evidence, that Walter Sheridan, the agent in charge of the investigation, had never given him any device or listening instrument to assist him in his work. Transcript at 3006A. At the hearing to determine the legality of the recording of the King-Partin conversation, Sheridan testified that Partin had made his car available for the concealed installation of the instruments and recorder. Testimony by James Neal, the prosecuting attorney, indicates that he was aware of the fact that Partin had cooperated in securing that recording.

The Partin testimony was crucial to the conviction of appellants. Had the Government revealed that Partin perjured himself during the trial, defense counsel could have used that fact to impeach this key Government witness.[1] I would remand the case to the District Court for a hearing to determine whether reversal is required by the principles announced in Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

---

1. Although I am aware of the limited scope of the Supreme Court's remand order in this case, I do not believe the District Court should thereby be prevented from taking cognizance of the possibility of a departure from basic fairness which might have tainted the outcome of the trial.