James R. HOFFA
v.
UNITED STATES of America.

Ewing KING
v.
UNITED STATES of America.

Larry CAMPBELL
v.
UNITED STATES of America.

Thomas Ewing PARKS
v.
UNITED STATES of America.

Civ. A. Nos. 6222, 6256, 6268, 6276.

United States District Court,
E. D. Tennessee, S. D.
Feb. 11, 1972.

Brown & Brown, Chattanooga, Tenn., for all plaintiffs.

John L. Boeger and Morris A. Shenker, St. Louis, Mo., for James R. Hoffa.

Moses Krislov, Cleveland, Ohio, for Ewing King.

Cecil D. Branstetter, Nashville, Tenn., for Larry Campbell and Thomas Ewing Parks.

John L. Bowers, Jr., U. S. Atty., Chattanooga, Tenn., Michael C. Slonsky, David J. Slattery, Charles Ruff, Department of Justice, Washington, D. C., for defendant.

## OPINION

FRANK W. WILSON, District Judge.

The petitioners, James R. Hoffa, Ewing King, Larry Campbell, and Thomas Ewing Parks, were jointly tried and convicted in this court on March 4, 1964, of willfully endeavoring to influence, intimidate, and impede jurors in the discharge of their duties in violation of the Federal Obstruction of Justice Statute (18 U.S.C. § 1503). The style of the criminal proceedings referred to was "United States of America vs. James R. Hoffa, Thomas Ewing Parks, Larry Campbell, and Ewing King," Criminal Docket No. 11,989 in this court. The case has since had a lengthy history. Suffice it to say at this point that the conviction and sentence of each defendant was affirmed upon the original appeal and upon three subsequent post-trial proceedings. The present petitions constitute the fifth post-trial proceedings wherein the petitioners have sought to set aside their convictions and sentences in the aforesaid criminal case. Each defendant has now fully completed serving the sentence imposed in the criminal case other than the defendant Hoffa, who has recently been released from the sentence of confinement but remains under parole supervision.

These cases, seeking further post-conviction relief, are presently before the Court upon the petition of James R. Hoffa filed pursuant to Section 2255, Title 28 U.S.C., and the petitions of Ewing King, Larry Campbell, and Thomas Ewing Parks, seeking relief by way of a Writ of Error Coram Nobis. All petitions are substantially identical and the Government has filed an identical response to each petition. No issue has been raised as to the availability of the Writ of Error Coram Nobis or as to the relief obtainable thereunder by those petitioners whose sentences have now been completed. The cases have accordingly been consolidated.

Each of the petitioners now before the Court seeks to have his conviction set aside and a new trial granted and as grounds for such relief allege that a witness who testified against them, Edward Grady Partin, gave false testimony on the criminal trial and that the Government allowed the testimony to go uncorrected even though it knew it to be false. The petitioners contend that such knowing use of false testimony amounts to a denial of due process as affirmed in the case of Napue v. Illinois (1959), 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217.

In response the Government denies that the witness Partin gave false testimony and denies that the Government knowingly used any false testimony in obtaining the petitioners' convictions. In support of their denial and in support of the factual and legal correctness of the defendants' convictions, the Government relies upon the record heretofore established in the criminal trial and in the previous post-trial proceedings.

In their present initial petitions the petitioners each alleged that the witness Partin testified falsely "that he had never agreed to be an informer, had never tried to trap anyone, and was not given instructions by Walter Sheridan concerning the overhearing of things and was never given any device or listening instrument by Walter Sheridan." They further allege that the falsity of this evidence and the Government's knowledge of that falsity was established in the course of the evidentiary hearings regarding electronic surveillance held in

connection with the petitioners' fourth motion for new trial. Upon direction of the Court, the petitioners have since amended their petitions so as to make specific reference to those portions of the criminal trial testimony which it is contended were false and were known to be false by the Government. It is accordingly appropriate that the Court should consider each of these references in the light of the full record, including the record upon the criminal trial and the record upon prior post-trial proceedings, including the record made at the evidentiary hearing upon the fourth new trial motion respecting electronic surveillance.

### Background

Since the foregoing records regarding the petitioners' convictions and post-trial proceedings have become so voluminous, it would be helpful at this point to make some summary statements regarding those records.

Upon May 9, 1963, the petitioners herein, James R. Hoffa, Thomas Ewing Parks, Larry Campbell, and Ewing King, were indicted, along with others, in a multi-count indictment charging them with conspiracy and with violation of the Federal Obstruction of Justice Statute. The various counts of the indictment charged the defendant Hoffa, along with one or more of the co-defendants, with having corruptly endeavored to influence jurors in connection with their deliberations in a prior criminal trial, often referred to in the record as the "Test Fleet Trial," wherein Mr. Hoffa was the only party defendant. The Test Fleet Trial occurred in October, November, and December 1962 in the United States District Court at Nashville, Tennessee, and resulted in a mistrial when the jury was unable to agree upon a verdict.

Following extensive pre-trial proceedings (see for example Hoffa v. Gray, 323 F.2d 178 (C.A.6, 1963); cert. denied 375 U.S. 907, 84 S.Ct. 199, 11 L.Ed.2d 147; United States v. Hoffa, D.C., 235 F.Supp. 611 (1964), affirmed 349 F.2d 20 (C.A. 6, 1965), affirmed 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) reh. denied 386 U.S. 940, 87 S.Ct. 970, 17 L.Ed.2d 880 (1967)), including the withdrawal of the original trial judge and the assignment of the undersigned as the trial judge, the criminal case here under attack went to trial in this court upon January 20, 1964. The first count, charging a criminal conspiracy, was severed, and the case went to trial upon the four substantive counts charging the defendants with obstruction of justice. The trial extended over a period of some seven weeks, involved some 123 witnesses and some 254 exhibits and accumulated a record of 9284 pages. At the conclusion of the Government's proof the Court directed a verdict of acquittal as to the defendant Hoffa upon the second count, deeming the evidence insufficient upon that count to submit to the jury.[1] The trial continued from day to day until March 4, 1964, when the jury returned a verdict finding the defendants Hoffa, Parks and Campbell guilty upon the third count and finding the defendants Hoffa and King guilty upon the fifth count. The jury found the defendants Hoffa, Tweel, and Dorffman not guilty upon the fourth count.

Without attempting any detailed summary of the evidence, the substance of the testimony of the Government's witnesses may be briefly stated as follows.

On October 22, 1962, the selection of the jury commenced in the United States District Court at Nashville, Tennessee, in the "Test Fleet" case, a criminal trial in which Mr. Hoffa was the only party defendant. Two associates frequently with Mr. Hoffa throughout the trial were Ewing King, an official of the Teamsters Union Local at Nashville, Tennessee, and Edward Grady Partin, an official of the Teamsters Local at Baton Rouge, Louisiana. Upon the second day

---

[1]. The co-defendant named in the second count was tried in a separate trial and found guilty. His conviction was affirmed upon appeal. See United States v. Medlin, 353 F.2d 789 (C.A. 6, 1965).

of the jury voir dire Mr. James Tippens, one of the prospective jurors, reported to the trial judge, William E. Miller, that he had been contacted the previous evening by one Lawrence Medlin regarding his jury service and reported his conversation with Medlin in this regard. Judge Miller excused the juror from the panel and advised Mr. Hoffa and his counsel that Mr. Tippens had reported that he had been offered $10,000 by Mr. Medlin "to be paid in one hundred dollar bills" to influence him if he were selected as a juror. In regard to this juror incident, Mr. Hoffa stated to Mr. Partin that "The dirty bastard went in and told the Judge his neighbor had offered him $10,000. We are going to have to lay low for a few days."

One of the jurors selected to try the "Test Fleet" case was Gratin Fields, a black man. During the course of the "Test Fleet" trial, Larry Campbell, a business agent in the Detroit Teamsters Union Local, of which Mr. Hoffa was president, contacted in Nashville his uncle, Thomas Ewing Parks, also a black man, and got him in turn to contact the son of juror Gratin Fields and offer $5,000 to the son and $5,000 to his juror father if the son would talk to his father and have him vote for the acquittal of Mr. Hoffa. Following this Mr. Hoffa stated to Mr. Partin that he had a colored male juror in his hip pocket and that his business agent, Larry Campbell, had fixed it. Upon other occasions Mr. Hoffa stated to Mr. Partin that all that was needed was a mistrial as the case would never be tried again and that he would pay $15,000 or $20,000 or whatever it cost to get to the jury.

Another juror selected to try the "Test Fleet" case was Mrs. James M. Paschal. Mrs. Paschal's husband was employed by the State of Tennessee as a highway patrolman. The Paschals lived in Woodbury, Tennessee, some distance from Nashville. After repeated urgings from Mr. Hoffa, Ewing King

went to Woodbury on the night of November 17, 1962, and, along with an associate, Oscar Pitts, met Mr. Paschal at a secluded spot at 1:30 A. M. At that time Mr. King represented that he had influence in the state administration and that he would get Mr. Paschal a promotion in the Tennessee Highway Patrol if he, Paschal, would talk to his wife and get her to vote for the acquittal of Mr. Hoffa. After this was reported to Mr. Hoffa, he became upset because King had not gotten Mr. Paschal to take money, as that would have pinned him down. The "Test Fleet" trial ended in December 1962 in a mistrial when the jury was unable to agree upon a verdict.

Following the guilty verdicts the defendant Hoffa was sentenced a total of eight years, the defendant Parks was sentenced three years, the defendant Campbell was sentenced three years, and the defendant King was sentenced three years. A motion for a new trial was overruled and an opinion entered thereon. On appeal the conviction of each defendant was affirmed. United States v. Hoffa, 349 F.2d 20; affirmed 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), rehearing denied 386 U.S. 940, 87 S.Ct. 970, 17 L.Ed.2d 880 (1967).

A second motion for a new trial was filed on March 18, 1964, alleging newly discovered evidence. This motion was denied and the denial affirmed on appeal. United States v. Hoffa, D.C., 247 F.Supp. 692 (1965), affirmed 376 F.2d 1020 (6 Cir. 1967), cert. den. 389 U.S. 859, 88 S.Ct. 102, 19 L.Ed.2d 124 (1967).

A third motion for a new trial, alleging newly discovered evidence, was filed September 1, 1965. This motion was denied. United States v. Hoffa, D.C., 247 F.Supp. 692 at 698 (1965); see also 245 F.Supp. 772 (D.C.1965). The denial of the third motion was affirmed on appeal. 382 F.2d 856 (6 Cir. 1967), cert. denied 390 U.S. 924, 88 S.Ct. 854, 19 L.Ed.2d 984 (1968).[2]

2. An affiant signing an affidavit in support of the third motion for new trial was indicted and convicted of perjury in connection with that affidavit. See United

A fourth motion for a new trial was filed upon February 28, 1967, alleging newly discovered evidence of unlawful electronic surveillance. An evidentiary hearing was set upon this motion but upon that hearing counsel for the defendants advised that they were unable for ethical reasons to present any evidence in support of their motion. The fourth motion was thereupon decided upon the affidavits previously filed and was denied. United States v. Hoffa, D.C., 268 F.Supp. 732 (1967). The denial was affirmed upon appeal. 398 F.2d 291 (C.A.6, 1968). While a petition for certiorari was pending in the United States Supreme Court regarding the fourth motion for a new trial, the Government made disclosure of certain electronic surveillances directed at others but in which two of the defendants may at times have appeared. Upon this disclosure being made, the United States Supreme Court remanded the case to this court for further proceedings in regard to the disclosure. An evidentiary hearing extending over six trial days and involving 33 witnesses was thereupon held. In the course of that hearing evidence was presented that upon May 8, 1963, some several months after the "Test Fleet" trial and one day before the indictment was returned in the criminal case here under attack, the Government installed a recording device in the automobile of Mr. Partin with his knowledge and consent and he had certain conversations with Mr. King on that date in the automobile. These matters are fully set forth in the opinion of this Court entered at the conclusion of that hearing and in which opinion the Court found no constitutional right of any defendant to have been violated in connection with any electronic overhearings, including the Partin-King recording, and further found that any matters overheard had not in any way been used upon the criminal trial, nor did they otherwise taint that trial. See United States v. Hoffa, D.C., 307 F.Supp. 1129

(1970). This action of the Court was affirmed upon appeal. 437 F.2d 11 (C.A. 6, 1971), cert. den. 402 U.S. 988, 91 S. Ct. 1664, 29 L.Ed.2d 154 (1971).

## Legal Guidelines

Having completed a brief summary of the proceedings in this case to the date of the present petitions, it is appropriate to consider further the contentions made in those petitions. Before doing so, however, certain legal guidelines and principles should be noted.

The principle of law upon which the petitioners rely in their present petitions is that the Government may not knowingly use false testimony to obtain a criminal conviction. The leading recent authority for this principle is the case of Napue v. Illinois (1959), 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217. In that case a convicted defendant, having received assurance from the prosecuting attorney of assistance in obtaining a reduction in his sentence, testified against a co-defendant. In the course of his examination by the prosecuting attorney he denied that any promise of assistance had been made to him. Although the prosecuting attorney knew this testimony to be false, he did nothing to correct it. The Court held that the knowing use of false testimony by the state's attorney amounted to a denial of due process and that a conviction so obtained must be set aside and a new trial granted. In line with this principle, the ultimate issue to be determined by the Court in the present case is whether the Government knowingly used false evidence to obtain the convictions of the petitioners.

██ A matter to note at this point, however, is that it is the *knowing use* by the Government of false evidence that constitutes the denial of due process. An allegation of perjury, apart from an allegation of knowing use by the Government of that perjury, constitutes no basis for habeas corpus or coram nobis

States v. Johnson, 414 F.2d 22, cert. den. 397 U.S. 991, 90 S.Ct. 1112, 25 L.Ed.

2d 399, reh. den. 397 U.S. 1071, 90 S.Ct 1495, 25 L.Ed.2d 696.

relief as it alleges no error of constitutional dimensions. The credibility of witnesses is ordinarily for trial by the jury in the criminal trial. False evidence and perjury are matters that may be raised on the trial and on motions for a new trial, but not in habeas corpus, Section 2255, or other post-conviction petitions. Otherwise every criminal conviction other than a plea of guilty would be subject to repetitious retrial on post-conviction petitions long after the criminal trial had occurred and long after time had erased both memories and witnesses, for few persons convicted of crime do not contend that something untrue was said in their trial. See United States v. Gonzalez, 33 F.R.D. 280, 282 (D.C., S.D.N.Y., 1960) affirmed 321 F. 2d 638 (C.A.2, 1963). Relevant matters in this regard are also discussed in the case of United States v. Osborne, 415 F.2d 1021 (C.A.6, 1969), involving a Section 2255 petition filed on behalf of one of the former attorneys for Mr. Hoffa in this case. Mr. Osborne was convicted upon a separate trial of endeavoring to bribe a member of the jury panel scheduled to try the criminal case here under attack. His conviction and sentence were affirmed upon appeal. See United States v. Osborne, 350 F.2d 497 (C.A.6, 1966) affirmed 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966) reh. den. 386 U.S. 938, 87 S.Ct. 951, 17 L.Ed. 2d 813 (1967).

■ Certain other principles of law generally relevant to habeas corpus, Section 2255 petitions, and other post-conviction petitions should be noted. The first such general principle of law to note is that mere allegations in such petitions of legal conclusions, apart from allegations of fact supporting those conclusions, are legally insufficient to entitle a petitioner to relief or to require an evidentiary hearing. A post-conviction petition must allege facts, which, if true, would entitle the petitioner to relief before an evidentiary hearing is required and before the relief requested can be granted. 28 U.S.C. § 2255; Stein

v. United States, 390 F.2d 625 (C.A.9, 1968).

■ Finally, it is likewise settled law that even though allegations of fact are made in a habeas corpus petition, if the prior record in the case conclusively refutes those allegations of fact, then no evidentiary hearing on the petition is either necessary or appropriate. The petition then becomes one alleging mere legal conclusions. 28 U.S.C. § 2255; Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148; Evans v. United States, 408 F.2d 369 (C.A.7, 1969).

### Allegations of Perjury

Returning to the pending petitions, a review of the allegations in those petitions in light of the prior recorded testimony must be undertaken in order that the Court may determine whether an evidentiary hearing will be necessary or appropriate. It is alleged that certain testimony given by the witness Partin in the criminal trial was false and that both the falsity of the testimony and the Government's knowing use of that false testimony is shown by the evidence received at the hearing on electronic surveillance in connection with the fourth motion for new trial. The first step in testing the sufficiency of these allegations to require an evidentiary hearing must be to place each alleged instance of perjury in its proper context. It may then be compared with the evidence received on the fourth new trial motion to determine whether evidence of falsity and of knowing use thereof by the Government exists.

For the purpose of placing each instance of alleged perjury in its proper context the citations of perjury will be considered in the order in which they are alleged in the amended petition of James R. Hoffa and as adopted by the other petitioners. By way of general preface, it should be noted that each instance of alleged use of perjured testimony relates to the testimony of the witness, Edward Grady Partin. Mr. Partin

testified upon direct examination upon portions of two days and testified upon cross-examination for five days. His testimony covers some 1800 pages in the record [Tr. pp. 2981–4731 (Tr. citations are to the criminal trial transcript)].

(1) The first instance of alleged perjured testimony cited by the petitioners (¶ a) is the testimony of the witness Partin wherein he testified at the criminal trial, "I have never agreed to be an informer." (Tr. p. 3569) Placing the testimony in context, it should be noted that the cited testimony occurred upon the cross-examination of Mr. Partin and in his third day of testimony. He had previously fully described the circumstances under which he associated with Mr. Hoffa at the "Test Fleet" trial in Nashville, the circumstances under which he agreed to provide information to the Government, and the information he had provided. (Tr. pp. 2981–3568) The line of inquiry immediately preceding the testimony cited as perjury was with regard to the date upon which Partin had first discussed with a government agent his willingness to provide information. The question then stated by the cross-examiner was, "When did you agree to be an informer?" And the answer was, "I never agreed to be an informer, Sir." In making this response it is apparent that the witness was objecting to the form of the question in describing him as an "informer". It is likewise apparent that counsel for the defense so understood, for in the very next question he reframed his question to omit the designation "informer" and inquired, "When did you tell anybody, whether it is a government or a state agent, that you would furnish information about Mr. Hoffa and the trial?" The witness then responded that this occurred after he had talked by telephone with Mr. Hoffa and learned that he was to meet him in Nashville. (Tr. p. 3575) Not only did the witness Partin disclose in his testimony the facts and circumstances as to when he agreed to provide information to the Government, but other government agents and witnesses were examined and cross-examined at length regarding these matters. See, for example, the testimony of the witnesses Sheridan (Tr. pp. 3125–3174 and 8151–8248), Daniels (Tr. pp. 5848–5925 and 8086–8149), Grimsley (Tr. pp. 8024–8085), and Pitcher (Tr. pp. 7133–7151). When read in context, it is apparent that the defendants were in no way misled or misinformed by the witness having rejected the designation of "informer". Furthermore, as noted above, the facts regarding the time and circumstances under which the witness Partin agreed to provide information to the Government were testified to in detail by other witnesses.

(2) The second instance of alleged perjured testimony cited by the petitioners (¶ b) is the following testimony of the witness Partin:

"Q Isn't it true that Mr. Sheridan kept urging you to get more and more evidence on more and more people?

"A He has never urged me to do anything other than what I saw." (Tr. p. 4118)

Placing this testimony in context, it occurred on the fifth day of the witness Partin's testimony and in his cross-examination by counsel for the defendant Dorfman. The witness was being examined regarding his testimony relating to conversations and telephone calls between defendants Dorfman and Tweel regarding their attempt to get a Nashville bar tender, Dallas Hall, to seek to influence a juror. The line of inquiry immediately preceding the testimony cited as perjury was with regard to whether the telephone calls between Dorfman and Tweel did not in fact relate to certain legitimate business transactions. The questions and answers at this point were as follows:

"Q Now isn't it true that the phone calls that you say that you heard were really related to those business transactions and to the Hotel Pritcher at Huntington and the office building known as the West Virginia Building?

"A  I have never heard of those names before, Sir.

"Q  You never heard of that?  Isn't it true that Mr. Sheridan, Mr. Robert Kennedy's associate to whom you were reporting all these things, kept urging you to get more and more evidence on more and more people?

"A  He never urged me to do anything other than what I saw."

The witness had previously stated on his direct examination that his instructions from Mr. Sheridan was only to report matters regarding jury tampering. He had previously been asked a number of times on cross-examination regarding these instructions.  When asked again he summarized his former testimony by saying, "He has never urged me to do anything other than what I saw."  Mr. Sheridan also testified on these matters. (Tr. pp. 3125–3174)

(3) The third and fourth instances of alleged perjury cited by the petitioners (¶¶ c and d) are the following extracts from the testimony of the witness Partin:

".  .  .  I wasn't interested in getting anyone involved."  (Tr. p. 4517)

\*    \*    \*    \*    \*    \*

"What you are saying, are you trying to make it look like I trapped someone as such?  No."  (Tr. p. 4517)

Placing the above testimony in context, it occurred upon the sixth day of the witness Partin's testimony and in the course of his cross-examination by counsel for the defendant Parks.  The witness was being examined regarding his testimony that he had been advised by Mr. Buffalino, an attorney and Teamsters Union official, with respect to a grand jury subpoena.  The questions and full answers at this point were as follows:

"Q  Were you looking to inveigle Mr. Buffalino into making a statement when you came to him as a client and to discuss this subpoena before the grand jury, were you then looking to inveigle Mr. Buffalino into saying something which you could then carry back to Mr. Sheridan?

"A  I didn't see anything to get him involved with, Sir.  I wasn't interested in getting anyone involved.

"Q  At no time in your whole career in 1962 you had no interest in seeing anyone get involved in anything?

"A  What you are saying, are you trying to make it look like I tried to trap someone as such?  No."  (Tr. p. 4517)

(4) The fifth instance of alleged perjury cited by the petitioners (¶ e) was given by the witness Partin out of the presence of the jury and in the course of a motion to suppress his testimony.  The witness was being questioned by counsel for the defendant Dorfman regarding instructions given him upon his first coming to Nashville and his first contact with Mr. Sheridan, the government agent, in October 1962.  The testimony was as follows:

"Q  You called him the first time to meet him.  Is that right?

"A  I certainly did.

"Q  Now on that occasion the jury was being picked.  Is that right?

"A  I believe they were, I am not sure of that now.

"Q  Did he give you any instructions with respect to your duties in overhearing things between the various parties in the case?

"A  No, Sir.  I didn't have any duties when it came to that.

"Q  Did he give you any instructions?

"A  Only if I heard any on jury tampering.

"Q  Did he explain to you what he meant?

"A  Attempting to influence the jury, buying them off.

"Q  What?

"A  Attempting to buy the jury off or influence the jury by buying them or some other means.

"Q  I see.  Now, when was the first time you made a report to him?

"A  I didn't call it a report.  I think I talked to him the afternoon of the

day I was—the first day I came in on the 9th.

"Q Did he give you any device or listening instrument to assist you in your work?

"A No, Sir." (Tr. pp. 3006–3006A)

It is clear that the foregoing testimony refers to the first meeting of Mr. Partin with Mr. Sheridan in October of 1962.

(5) The sixth instance of alleged perjury cited by the petitioners (¶ f) is the following testimony of the witness Partin: "I wasn't working for the Government, Sir." (Tr. p. 3022) This testimony was given out of the presence of the jury and in the course of a motion to suppress the witness's testimony. The witness was being questioned regarding his having given information to Mr. Sheridan, a government agent, during the course of the "Test Fleet" trial in October through December of 1962. Just prior to the cited testimony, the witness had testified as follows:

"Q Were you paid by the Government?

"A No, I wasn't.

"Q Were you promised anything by the Government?

"A No, I wasn't." (Tr. p. 3020)

Then followed the cited testimony:

"Q Did you ever at any time advise Mr. Hoffa or anyone connected with the defense of his case, either attorney or assistants, that you were working for the Government?

"A I wasn't working for the Government, Sir." (Tr. p. 3022)

Matters regarding payments made by the Government to Mrs. Partin for Mr. Partin's account were fully disclosed in the trial. The testimony regarding these payments was that they were for reimbursement of Mr. Partin's expenses incurred in meeting with government attorneys in preparation for the trial and at a date subsequent to all matters involved in the "Test Fleet" trial.

(6) The seventh instance of alleged perjury cited by the petitioners (¶ g) follows immediately after the above stated

testimony and was accordingly given in the same context. After stating that he was not working for the Government, the next questions and answers were as follows:

"Q Did you ever advise them that you were furnishing the Government information?

"A No.

"Q Did you ever receive any instructions from Mr. Sheridan which related to your obtaining information concerning the course of the case?

"A No.

"Q Did you ever receive any instructions from him after the first time you talked to him?

"A By instructions what do you mean? Would you qualify it?

"Q By instructions to refrain from doing an act or saying certain things.

"A No, Sir.

"Q Did he ever tell you to say certain things to Mr. Hoffa or any of the people connected with the case?

"A No, certainly not." (Tr. p. 3022)

(7) The next citation of alleged perjury on the part of the witness Partin (¶ h) consists of a series of summary references regarding the circumstances under which the witness came to Nashville to be with Mr. Hoffa during the "Test Fleet" Trial in October, November and December of 1962. Without commenting on the accuracy of the summary, suffice it to say that these matters were explained thoroughly and repetitiously throughout both the direct and the cross-examination of the witness. All matters in connection therewith were fully disclosed to the defendants during the course of the trial, including the recordings of the telephone conversations between Mr. Partin and Mr. Hoffa, and these were read to the jury. (Tr. pp. 7540–7551) The defendants' contentions regarding any conflict in the evidence in connection with the cited testimony was fully presented to the jury. The defendants' contentions in this regard

were likewise presented upon appeal and found to be without merit.

(8) The next citation of alleged perjury on the part of the witness Partin (¶ i) consists of the following testimony:

"Q  Did you have any kind of recording machine or something to take down everything that you heard so that you could review and impress your mind with it?

"A  No, Sir, I did not." (Tr. pp. 3624–3625)

Placing this testimony in context, it should be noted that the cited testimony occurred upon the cross-examination of Mr. Partin and in the third day of his testimony. He had just previously been asked by the cross-examiner to repeat his testimony regarding his conversation with Mr. Hoffa upon the date of October 25, 1962, a date shortly after the commencement of the "Test Fleet" trial. Before responding the witness asked first to see the hotel registration records showing the dates he was in Nashville so that he could place the date being referred to. The line of testimony at this point was as follows:

"Q  On October 25 did Mr. Hoffa make a statement to you and didn't you testify that he did make a statement?

"A  I believe I did. If I could see, I mean—

"Q  (Interposing) Well, I can't show you the statement. You didn't take any notes, did you?

"A  I'm not talking about the statement. No, Sir, I am talking about the hotel record.

"Q  Did you take any notes, Mr. Partin?

"A  I answered you on that long ago, no.

"Q  Answer me again, Sir.

"A  I said no, Sir.

"Q  Did you have any kind of recording machine or something to take down everything that you heard so you could review and impress your mind with it?

"A  No, Sir, I did not." (Tr. pp. 3624–3625)

It is clear that this refers to the conversation between Mr. Hoffa and Mr. Partin on October 25, 1962.

(9) The next citation of alleged perjury on the part of the witness Partin (¶ j) consists of the following testimony:

"Q  And how many times have you visited anybody connected with the Government in Washington in the Department of Justice or the F.B.I.?

"A  One time that I know of, Sir."

Placing this testimony in context it occurred upon the fifth day of the witness Partin's testimony and in the course of his cross-examination by counsel for the defendant Parks. Just previously he had been asked:

"Q  Did you go to Washington from July 1962 to the end of December 1962?

"A  It is possible. I have been to Washington several times.

"Q  Did you visit anybody connected with the Department of Justice?

"A  I talked to Mr. Sheridan at one time I was there, yes, Sir." (Tr. p. 4245)

The cross-examination then continued:

"Q  And did you meet Bobby Kennedy, the Attorney General?

"A  No, Sir. I never met him." (Tr. p. 4247)

\*     \*     \*     \*     \*     \*

"Q  Well, could you fix it in your mind any better than a mere belief, would you say it definitely happened after the 22nd of October?

"A  Well, I would think so, I have been there so many times to Washington on other matters and things.

"Q  Yes, and how many times have you visited anybody connected with the Government in Washington at the Department of Justice or the F.B.I.?

"A  One time that I know of, Sir.

"Q  Pardon me?

"A  One time that I know of.

"Q  That's the only time?

"A  As far as I can remember definite it was unless it would have been when

I have been introduced to one of the people that I was visiting over to the capitol."

(Tr. p. 4252)

*Allegations of Knowing Use of Perjury*

This completes the citation of alleged perjured testimony as set forth in the amended petition now before the Court. The remaining portions of the amended petition (¶ 3 to end) set forth the petitioners' contentions in support of their allegation that the cited testimony was false and that the Government used it with knowledge that it was false. The original petition, before amendment, alleges that both the falsity of the testimony and knowledge on the part of the Government of its falsity is established by the evidence introduced upon the fourth motion for new trial relating to electronic surveillance and to which reference has previously been made. It will accordingly be necessary to review the pertinent parts of that record and compare them with the testimony of the witness Partin, which testimony is cited as being false. Before doing this, notice should be taken of certain contentions advanced in the amended petition and which are not related to the evidentiary record on the fourth new trial motion.

■ The contention is made in paragraph 4 of the amended petition that knowing use of perjured testimony occurred when the witness Partin denied having agreed to be an informer. As noted in paragraph (1) above, the circumstances under which Mr. Partin was associated with Mr. Hoffa at the "Test Fleet" trial in Nashville, the circumstances under which he agreed to provide information to the Government, and the information which he provided were fully and exhaustively presented and tried before the jury. The witness's rejection of the defendants' characterizing him as an "informer" withheld no fact from the jury regarding his activities. These matters were fully argued before the jury and the credibility of the witness was for the jury. When this testimony is viewed in context, and in light of the full record upon the trial, it could form no basis for a charge of knowing use of perjured testimony by the Government.

The further contention is made in paragraph 4 of the amended petition that knowing use of the perjured testimony occurred in the testimony of Mr. Partin regarding the circumstances under which he came to Nashville to be with Mr. Hoffa during the "Test Fleet" trial. These matters were fully tried and argued before the jury. They were likewise argued in the first motion for new trial and on appeal, and were found to be without merit. See United States v. Hoffa, 349 F.2d 20, affirmed 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), reh. den. 386 U.S. 940, 87 S.Ct. 970, 17 L.Ed.2d 880 (1967).

It is further contended that Mr. Partin's testimony regarding the number of his visits to Washington is in conflict with testimony in the surveillance hearing that a witness saw him there upon three occasions. The review of Mr. Partin's testimony in this regard and as set forth in paragraph (9) above would reflect no conflict. He testified that he had been to Washington many times, that he recalled having visited the Department of Justice one time and having been introduced on other times.

■ Turning to the evidentiary record made upon the fourth motion for new trial, reference is made to the opinion of this Court on that motion wherein a full discussion of that record is set forth. See United States v. Hoffa, D.C., 307 F.Supp. 1129 at 1138. As reflected in that opinion, testimony was received that upon May 8, 1963, some several months after the "Test Fleet" trial, and one day before the indictment was returned in the criminal case here under attack, the Government installed a recording device in Mr. Partin's automobile with his knowledge and consent and he had certain conversations with Mr. King on that date in the automobile. As found by the Court in its opinion, and as affirmed upon appeal [See United States v. Hoffa, 437 F.2d 11 (C.A.6, 1970) cert. den. 402 U.S. 988, 91 S.Ct. 1664, 29 L.Ed. 2d 154 (1971)], this recording disclosed

no information not previously known to the Government and was discarded as useless by the Government. It is the essence of the petitions now before the Court that the failure to disclose the fact and the existence of the Partin-King recording in the course of the criminal trial renders false the testimony of the witness as hereinabove cited and discussed in paragraphs (1) through (9), and renders its use by the Government without correction a violation of due process under the case of Napue v. Illinois, (1959) 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217. The clear answer to this contention is that the witness Partin was never asked a question in the course of the criminal trial that would call for a response disclosing the Partin-King recording and the witness never gave a response that would deny the existence of that recording. The Partin-King recording simply formed no part of the criminal trial, as found in the Court's opinion upon the fourth motion for new trial. As stated in that opinion (307 F. Supp. 1129 at 1141):

> "The recording, if used in the trial, would at the very most have been of a purely cumulative nature. Nothing was said in the recording of the slightest relevance to the trial that was not testified to by witnesses in the trial, including both Partin and King. The only other possible use of the recording would have been for the cross-examination of the witness Partin. The extremely extensive cross-examination of this witness on all matters, including all matters touched upon in the recording, renders any possible error in the non-disclosure of the recording harmless beyond a reasonable doubt. This conclusion is further required by the extensive and overwhelming nature of the evidence of each defendant's guilt when the record is viewed as a whole."

In view of the clear lack of merit of the petitions before the Court on the face of the record, it is unnecessary to consider further motions pending herein. Orders will enter dismissing each petition.